**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:08-CV-460**


CAROLINA     POWER     &     LIGHT    )
COMPANY d/b/a PROGRESS ENERGY    )
CAROLINAS, INC.,    )
    )
            **Plaintiff,**    )
    )
**vs.**    )          **COMPLAINT**
    )
**AMEREN CORPORATION as successor-in-**
**interest to UNION ELECTRIC;**    )
    )
**AMERICAN ELECTRIC**    )
**CORPORATION;**    )
    )
**TOWN OF BLACKSTONE, VIRGINIA;**    )
    )
**BONNER ELECTRIC, INC.;**    )
    )
**CHEVRON MINING, INC. as successor-in-**
**interest to PITTSBURG & MIDWAY**    )
**COAL MINING COMPANY;**    )
    )
**COHEN AND GREEN SALVAGE**    )
**COMPANY, INC.;**    )
    )
**OWEN ELECTRIC STEEL COMPANY**    )
**OF SOUTH CAROLINA and/or SMI-**    )
**OWEN STEEL COMPANY, INC. and/or**    )
**SMI STEEL d/b/a CMC STEEL SOUTH**    )
**CAROLINA, an Alabama corporation**    )
**operating a steel plant in Cayce, South**    )
**Carolina and/or COMMERCIAL METALS**    )
**COMPANY as successors-in-interest to SMI**    )
**STEEL;**    )
    )
**COOPER INDUSTRIES, INC. as**    )
**responsible party for ABEX FRICTION**    )
**PRODUCTS DIVISION OF ABEX, INC.;**    )
    )

COTTER ELECTRIC COMPANY;                    )
                                            )
CITY OF DOVER, DELAWARE;                    )
                                            )
ENDICOTT CLAY PRODUCTS                      )
COMPANY;                                    )
                                            )
HAGERSTOWN LIGHT DEPARTMENT;                )
                                            )
HUNTSVILLE UTILITIES;                       )
                                            )
JET ELECTRIC MOTOR COMPANY,                 )
INC.;                                       )
                                            )
JOHN E. KELLY & SONS ELECTRICAL             )
CONSTRUCTION INC. and/or KELLY              )
GENERATOR & EQUIPMENT, INC.                 )
and/or KELLY ELECTRICAL                     )
CONSTRUCTION, INC. as successor-in-         )
interest to KELLY ELECTRICAL;               )
                                            )
LAFARGE MID-ATLANTIC, INC. and/or           )
LAFARGE MID-ATLANTIC, LLC and/or            )
REDLAND GENSTAR as successors-in-           )
interest to GENSTAR STONE PRODUCTS          )
COMPANY;                                    )
                                            )
LEWIS ELECTRIC SUPPLY CO., INC.;            )
                                            )
CITY OF MASCOUTAH, ILLINOIS;                )
                                            )
M-P ELECTRICAL CONTRACTORS,                 )
INC.;                                       )
                                            )
NEW SOUTHERN OF ROCKY MOUNT,                )
INC.;                                       )
                                            )
NORTH CAROLINA STATE FAIR, a                )
division of the NORTH CAROLINA              )
DEPARTMENT OF AGRICULTURE AND               )
CONSUMER SERVICES;                          )
                                            )
P.C. CAMPANA, INC.;                         )
                                            )
                                            )
                                            )

**PHOENIX SOLUTIONS COMPANY as**
**successor-in-interest to PLASMA ENERGY**
**COMPANY;**

**SURRY-YADKIN ELECTRIC**
**MEMBERSHIP CORPORATION;**

**TENNESSEE ASSOCIATED ELECTRIC,**
**INC. a/k/a TENNESSEE ASSOCIATED**
**ELECTRIC HOLDINGS, INC.;**

**VENTECH ENGINEERS INC. and/or**
**VENTECH PROCESS EQUIPMENT, INC.**
**and/or VENTECH EQUIPMENT INC.**
**and/or VENTECH COMPANIES  as**
**successors-in-interest to VENTECH**
**EQUIPMENT;**

**VEOLIA ENVIRONNEMENT SA and**
**VEOLIA ENVIRONMENTAL SERVICES**
**as successors-in-interest of MONTENAY**
**POWER CORPORATION n/k/a VEOLIA**
**ENVIRONMENTAL SERVICES WASTE-**
**TO-ENERGY;**

**W.R. SCHOFIELD CONSTRUCTION CO.,**
**INC.;**

     **Defendants.**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Plaintiff Carolina Power & Light Company d/b/a Progress Energy Carolinas, Inc. ("PEC" or "Plaintiff") by and through its undersigned attorneys, files this Complaint and in support alleges as follows:

**NATURE OF THE CASE**

1.  This is an action brought under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601-9675, for response costs, for contribution, and for all damages Plaintiff has suffered consistent with the

National Contingency Plan as a result of releases or threatened releases of one or more hazardous substances at or from the Ward Transformer Superfund Site, Raleigh, Wake County, North Carolina (the "Site"). Plaintiff also seeks a declaratory judgment that Defendants are jointly and severally liable for all response costs at the Site consistent with the National Contingency Plan.

## FACTUAL BACKGROUND

2.    The Site is located on Mt. Herman Road near the Raleigh-Durham International Airport in Raleigh, Wake County, North Carolina.    The Site is a former transformer manufacturing, repair, sales, and reconditioning facility located on approximately 11 acres of land (the "Ward Property") and two adjacent parcels located north and southeast of the Ward Property (the "Adjacent Parcels").    The Site is generally depicted on the map attached as Appendix C to the Administrative Settlement Agreement and Order on Consent for Removal Action, CERCLA Docket No. 04-2005-3778, effective September 16, 2005 (the "Administrative Settlement").

3.    The Ward Property is and has been owned by Ward Transformer Company, Inc. The Adjacent Parcels are under different ownership.   Reward Properties, L.L.C. owns the adjacent parcel on the north side (the "Reward Parcel"), and Reward Statesville, L.L.C. owns the adjacent parcel on the southeast side (the "Reward Statesville Parcel").

4.    The first buildings, offices, and other improvements on the Ward Property were constructed in 1964 on previously undeveloped land (the "Ward Facility").   Starting in 1964 until operations ended in 2005, the Ward Facility was used for manufacturing, repairing, selling,

and reconditioning electrical transformers, switchgear, capacitors, voltage regulators, and similar types of electrical equipment.[1]

5.      From 1964 until 1997, Ward Transformer Company, Inc. operated the transformer and electrical equipment business at the Ward Property.  In 1997, Ward Transformer Sales and Service, Inc. assumed operations at the Ward Property and continued those operations until 2005. (Ward Transformer Company, Inc., and Ward Transformer Sales and Service, Inc., are hereinafter collectively referred to as "Ward.")

6.       Ward's business mostly involved making repairs to transformers and the sale and consignments of used transformers.  The repairs ranged from the replacement of exterior gauges to a complete rebuilding and rewinding of a transformer.  Ward also purchased, rebuilt, consigned, and sold used transformers.  The used transformers Ward acquired, either for its inventory or on consignment, were stored in the open back lot at the Ward Facility.  Some of the used transformers required complete rebuilding in order to be sold.  Others were ultimately scrapped.  Whether Ward acquired a transformer through an outright purchase for its inventory or on consignment, Ward generally performed needed repairs and reconditioning work on the transformer at the Ward Facility before it was sold.

7.      The function and purpose of a transformer is to change an electrical current, typically by lowering or "stepping down" the current.  Transformers are composed of "coils" or "windings" made of copper or aluminum wire wrapped around an iron core.  The core and coil are housed inside a steel tank and submerged under a dielectric fluid ("oil") to cool, insulate, and protect the electrical components.  There are usually various gauges and devices on the outside

---

[1] Although Ward handled several types of oil-filled electrical equipment, the majority of its work involved transformers.  Thus, this Complaint generally refers to "transformers," but other types of electrical equipment are contemplated by the use of this term.

Case 5:08-cv-00460-FL   Document 1   Filed 09/12/08   Page 5 of 33

of a tank to mark the oil level, show the temperature, and allow for pressure release, among other things. Transformers also often have radiators or bushings attached to the outside of the tank. Transformer manufacturers mark them with a "nameplate" that typically shows the name of the manufacturer, the serial number, the quantity of oil in the tank, the electrical specifications, and installation information.

8. The Ward Facility had the capability to service a variety of electrical equipment, including pole-mounted, pad-mounted, and substation transformers. Ward had the equipment and personnel to fabricate new coil or aluminum windings, "bake out" ovens to completely remove water from inside the units, and equipment to fill the transformer tanks with new oil under vacuum. In addition, Ward personnel were able to reconfigure transformers to a customer's unique electrical needs or to meet a certain sizing limitation, and were able to manufacture transformers under their own nameplate.

9. The work performed at the Ward Facility often required the removal or replacement of the oil in the transformers and the disposal or treatment of such oil. The oil usually contained hazardous substances, including, but not limited to, polychlorinated biphenyls ("PCBs"). The work performed at the Ward Facility often resulted in the spillage of this oil on the Site and resulted in the release of oil or hazardous substances into the environment at the Site. In addition, some of this electrical equipment arrived at or was stored at the Ward site with the oil leaking out of the equipment. The existence of leaking equipment on the Site resulted in the release of oil or hazardous substances into the environment at the Site.

10. For example, a faulty unit would probably require a complete "rewinding" of the coil. This would require that Ward cut open the tank, pump the oil into storage tanks, remove the core and coil assembly with residual oil adhered to it, and place the coil assembly in an area

for servicing and storage. The core and coil generally contained an insulation material made of paper that would have been soaked with oil. Once the coil assembly was removed from the tank, the residual oil would drip and spill, contaminating both outdoor soil and the floor of the transformer repair building with PCBs and other hazardous materials.

11.     During the early years of the Ward Facility's operations, there were no regulations regarding the quantity of PCBs contained in transformer oil. Many transformers manufactured during these early years of the Ward Facility's operations contained oil sold under brand names, such as Pyranol or Askarel, which had very high levels of PCBs.

12.     In 1976, the United States enacted the Toxic Substances Control Act, 15 U.S.C. §§ 2601 *et seq.* ("TSCA"), which banned the manufacture, processing, and distribution in commerce of PCBs except (a) in a "totally enclosed manner" and (b) except as authorized by EPA regulations if EPA found that such activity would not present an unreasonable risk to human health or the environment. 15 U.S.C. § 2605(e)(2)(A-B). TSCA defines a "totally enclosed manner" as "any manner which will ensure that any exposure of human beings or the environment to a polychlorinated biphenyl will be insignificant as determined by the [EPA] Administrator by rule." 15 U.S.C. § 2605(e)(2)(C). EPA also further defined "totally enclosed manner" as a transformer that is intact and not leaking. *Id.* As to the risks posed by PCBs, the EPA Administrator found that the "manufacture, processing, and distribution in commerce of PCBs at concentrations of 50 ppm[2] or greater…present an unreasonable risk of injury to health within the United States." 40 C.F.R. § 761.20. Also under TSCA, starting on July 1, 1979, any person who desired to process or distribute in commerce PCBs required an exemption from the Administrator of the EPA. 15 U.S.C. § 2605(e)(3)(B).

---

[2] "[P]pm" is an abbreviation for "parts per million."

13.     EPA's PCB regulations promulgated pursuant to TSCA (the "PCB regulations") create three categories of electrical equipment.  First, transformers containing PCBs at a concentration of 500 ppm or greater (≥ 500 ppm) are "PCB Transformers."  *See* 40 C.F.R. § 761.3.  Some PCB transformers were prohibited, and the remainder were subject to substantial regulations and controls while they remained in use.  *See generally* 40 C.F.R. § 761.30(a).  Any repairs to PCB transformers that required removing the coil from inside the oil tank were prohibited, but routine servicing was allowed.  40 C.F.R. § 761.30(a)(2)(ii).  Second, "PCB-Contaminated Electrical Equipment" is electrical equipment, including transformers, capacitors, circuit breakers, voltage regulators, and electromagnets, with PCBs at a concentration of 50 ppm or greater and less than 500 ppm (≥ 50 and < 500 ppm).  40 C.F.R. § 761.3.  PCB-Contaminated electrical equipment is subject to various marking, documentation, handling, and disposal requirements, and processing or distribution in commerce of this equipment, including for purposes of servicing, requires an exemption from the EPA.  *See* 40 C.F.R. §§ 761.20(c), 761.30(a)(2)(vii).  Lastly, a transformer with less than 50 ppm (< 50 ppm) PCBs is a "Non-PCB Transformer."  40 C.F.R. § 761.3.   Non-PCB transformers are largely free of the TSCA ban, except for a few prohibited uses.  *See* 40 C.F.R. § 761.1(f)(4).

14.     The PCB regulations had a substantial affect on Ward's business operations.  Because PCB transformers (≥ 500 ppm) were substantially prohibited, Ward's work with this equipment, like that of any similar business, was greatly limited.  Additionally, Ward's work repairing and dealing in used transformers involved "processing" and "distribution in commerce" as defined by the PCB regulations.  Therefore Ward, like other used transformer repair shops and dealers, applied for an exemption to continue repairing and reselling PCB-Contaminated equipment (≥ 50 and < 500 ppm) after July 1, 1979.  Ward was allowed to continue processing

1064442-1

- 8 -

and distributing in commerce PCB-Contaminated transformers and other equipment while its application was pending before the EPA. Ward's practices with respect to non-PCB (< 50 ppm) equipment could continue without any approvals. However, Ward was required to begin testing and marking all equipment.

15. The PCB regulations include provisions for "reclassifying" a transformer from a PCB transformer to a PCB-Contaminated or Non-PCB transformer, or from a PCB-Contaminated transformer to a Non-PCB transformer. *See* 40 C.F.R. § 761.30(a)(2)(v). The reclassification process requires that the PCB oil or PCB-Contaminated oil be replaced with non-PCB oil.

16. Beginning in the late 1970s, many of Ward's repair customers requested that Ward replace the existing insulating oil in their transformers with "new non-PCB oil." In addition, by the early 1980s, Ward had adopted a general practice of replacing a transformer's oil with new, non-PCB oil when selling used transformers. Whenever Ward removed the oil in a transformer, it was required to properly store and/or dispose of the oil that it had removed, as required by the PCB regulations. The Ward Facility had several outdoor storage tanks to hold this oil. The oil was pumped out of the transformers in an outdoor area and piped into above-ground tanks.

17. Ward removed and disposed of the oil in many transformers. In December 1983, Ward contracted for the disposal of 1,815 gallons of PCB oil (> 500 ppm). From 1984 to 2004, Ward disposed of 48,085 gallons of PCB oil, 86,069 gallons of PCB-contaminated oil (≥ 50 and < 500 ppm), and 485,778 gallons of Non-PCB oil (< 50 ppm).

18. On August 16, 1985, Ward's application for an exemption to process and distribute in commerce PCB-Contaminated transformers was denied by the EPA. Thus, after this

date, Ward was substantially restricted in its authority to handle transformers containing 50 ppm or more PCBs.

19.     During the active operations of the Ward Facility from 1964 to 2005, numerous persons and companies, including Defendants as more specifically described below ("Potentially Responsible Parties" or "PRPs"), arranged for the repair and/or reconditioning of transformers and similar electrical equipment at the Ward Facility.  The PRPs sent their transformers to the Ward Facility or allowed another person or company to send their transformers to the Ward Facility, for the purpose of repair or so that the equipment could be sold to someone else.

a.     In the case of a repair transaction, the PRPs or their agents transported or arranged for transport of their transformers to the Ward Facility.  The PRPs or their agents agreed to the scope of repairs, and authorized Ward to repair and service the transformer, as needed, and return it to its owner.  The PRPs or their agents paid Ward for these services.

b.     In the case of a resale transaction, the PRPs or their agents accepted Ward's quotation or bid offer to purchase used or surplus transformers.  At the time of these sales, these transformers or other equipment often had been in service for a number of years and required repairs and reconditioning to be made suitable for resale.  In some instances, the transformers were leaking, inoperable, or were eventually scrapped.  The PRPs or their agents also agreed to a transportation arrangement with Ward to have the equipment removed from their facility and delivered to the Ward Facility.

c.     In the case of a consignment transaction, the PRPs or their agents agreed to allow Ward to handle repairs, reconditioning, and other servicing, as well as transportation, so that the transformers could be made suitable for resale.  In consignment

transactions, Ward was paid for its repair and reconditioning, and services as a percentage of the profits on each sale.

20.     Various investigations and sampling conducted by government authorities, as more fully described below, have uncovered substantial PCB contamination in the soils and sediments in and around the Site.  This contamination likely resulted from leaking transformers being stored at the Site, from spills or drips of oil when transformer oil was pumped in an open yard out of a transformer into the outdoor storage tanks, from spills or drips when the core and coil assemblies were removed for repair or servicing, and from runoff of PCBs when transformers were washed on arrival.   Some of this work on transformers occurred outside and some occurred inside the transformer repair building.  Both the concrete floor of the transformer repair building and the soil underneath it were found to be contaminated with PCBs.  In addition, PCBs were tracked by forklifts or by foot traffic around the Site.  Significant contamination was found in areas near the oil storage tanks, the outdoor transformer storage area, and near the septic system leach field.

21.     Inspection and investigation of the Site has further indicated that surface water run-off from contaminated areas was not completely controlled, allowing the continued release or threatened release of oil or hazardous substances.  Small creeks and wetlands border the Ward Property, and sediment and fish tissue samples taken downstream of the Site have shown PCB contamination.

**PROCEDURAL AND REGULATORY ENFORCEMENT HISTORY**

22.     In 1978, the United States Environmental Protection Agency ("EPA")  and the North Carolina Department of Environment and Natural Resources ("NCDENR") began investigating the Site after Ward Transformer Company, Inc.'s involvement in a release of PCBs

along hundreds of miles of rural North Carolina roadways. *See United States v. Ward*, 676 F.2d 94 (4th Cir. 1982); *United States v. Ward*, 618 F. Supp. 884 (E.D.N.C. 1985).

23.     During that investigation, EPA collected samples at and downstream of the Ward Facility and found PCB contamination in the soil at the Ward Facility and in the water and sediments along the surface water pathway draining the Ward Facility.

24.     In 1988 and 1989, EPA inspected the Ward Facility and found Ward to be in violation of certain inspection, recordkeeping, and storage requirements pertaining to PCB material under TSCA. EPA issued Ward an Administrative Complaint for failure to maintain records properly relating to PCB transformers. Ward entered into a Consent Agreement and Consent Order with EPA admitting the facts alleged in the complaint and agreeing to pay a fine.

25.     An emergency removal investigation conducted by EPA in 1993 concluded that PCB contamination was not found above emergency removal levels. Further remedial investigations of the Site, however, were planned.

26.     In May 1993, EPA listed the Site on CERCLIS, its database containing information about sites being considered for government action under CERCLA.

27.     In 1994 and 1995, NCDENR conducted sampling at the Site in conjunction with a Preliminary Assessment and a Site Inspection report. NCDENR found soil near the lagoon and a ditch to be contaminated with PCBs. It also found PCB contamination along the surface water pathway that drains the Site. NCDENR also determined that Ward used non-PCB transformer oil (<50ppm) to fuel its incinerator.

28.     In 1997, NCDENR conducted further sampling in conjunction with an Expanded Site Inspection. PCBs and other substances were found in soil at the Ward Facility and in

surrounding areas, including in and around wetlands located downstream of the Site. NCDENR recommended the Ward Facility for further action under CERCLA.

29.     On July 3, 2002, EPA sent Ward an Information Request Letter pursuant to Section 104 of CERCLA seeking information as part of its investigation of the Site. On August 29, 2002, EPA sent a General Notice Letter to Ward informing the company of its potential liability under CERCLA.

30.     On September 5, 2002, the Site was proposed for listing on the National Priorities List ("NPL"), the EPA's list of sites with the highest priority for CERCLA clean-up. The Site was listed on the NPL in April 2003.

31.     In April 2003, EPA began collecting soil samples in and around the Site as part of a Remedial Investigation ("RI"). EPA's Remedial Investigation Report ("RI Report"), dated September 2004, showed PCB contamination in the soil at the Site. Samples taken from an area near the front of the former main building of the Ward Facility contained PCBs in concentrations as high as 110 parts per million ("ppm"). Samples taken from the western portion of the Ward Facility that had been used for the storage of transformers, construction debris, and scrap metal (the "transformer storage area") contained PCBs in concentrations as high as 1,700 ppm. Sediments from the facility's storm water detention pond contained PCBs in concentrations up to 2,900 ppm. Areas downstream of the Ward Property leading to an unnamed tributary to Little Brier Creek showed PCB concentrations as high as 230 ppm. Soil on the Reward Parcel contained PCBs in concentrations as high as 26 ppm, and soil on the Reward Statesville Parcel contained PCBs in concentrations as high as 160 ppm.

32.     In December 2003, the North Carolina Department of Health and Human Services issued a fish consumption advisory for portions of Little Brier Creek and Brier Creek Reservoir.

1064442-1

In May 2004, a second fish consumption advisory was issued for Brier Creek and Lake Crabtree. Surface water from the Site drains into these waterways. The advisories were prompted by the presence of PCBs in fish living in these waterways.

33.     In August 2004, EPA conducted a removal assessment of the Site and determined that a time-critical removal action was necessary. EPA signed an Enforcement Action Memorandum on September 14, 2004. EPA determined that PCB contamination in soils at the Site were a source of PCB contamination in areas downstream of the Site. The storm water lagoon, curbing, and other improvements designed to contain runoff were not effective during heavy rains. EPA also found that downstream contamination was high enough to pose a risk to certain mammals and birds.

34.     The Enforcement Action Memorandum required that the storm-water management system at the Site be improved. It also required that in areas "effectively controlled" by the storm water management system, soil with concentrations of more than 25 ppm PCBs be delineated and removed from the Site. In areas *not* "effectively controlled" by the storm water management system, soil with concentrations of more than 1 ppm PCBs were to be delineated and removed from the Site. All removed soils were to be disposed or treated, and areas disturbed by the excavation were to be returned to their pre-removal condition. In the event that the storm-water management system was eliminated, the Memorandum required that all soils be remediated to 1 ppm PCBs or less.

35.     On October 20, 2004, the EPA notified Plaintiff, along with approximately 40 other companies, that it was considered a potentially responsible party ("PRP") with regard to the Site. The EPA provided Plaintiff and others an opportunity to conduct a time-critical removal action at the Site and to reimburse response costs expended by the EPA relating to the

1064442-1

Site.  The EPA provided further notice that the failure to perform appropriate removal actions and the failure to reimburse the response costs expended by the EPA at the Site would result in the issuance of a Unilateral Administrative Order and subject Plaintiff and the other notified parties to enforcement or recovery action under CERCLA and other environmental laws.

36.     Plaintiff and other parties, Ward Transformer Company, Inc.; Ward Transformer Sales and Service, Inc.; Reward Properties, L.L.C.; Reward Statesville, L.L.C.; Bassett Furniture Industries, Inc. ("Bassett"); Bishop Coal Company, n/k/a Consolidation Coal Company; Consolidation Coal Company; Itmann Coal Company, n/k/a Consolidation Coal Company ("Consol"); and C.P.&L., a/k/a Carolina Power & Light Company, d/b/a Progress Energy Carolinas, Inc. ("PEC") (all collectively, the "Settling Parties") entered into the Administrative Settlement with EPA, effective September 16, 2005. The Administrative Settlement obligates PEC, among other parties, to perform removal actions at the Site as specified in the Enforcement Action Memorandum (the "Response Actions"), to reimburse EPA for $725,440.83 plus interest for past response costs EPA had paid in connection with the Site, and to reimburse EPA for future response costs in an as-yet-undetermined amount that will be incurred by EPA for its oversight and enforcement activities after September 16, 2005.  The Administrative Settlement also includes a provision wherein the EPA covenants not to sue PEC under Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), for the removal activities and response costs at the Site.  The parties to the Administrative Settlement, including PEC, further agreed that the Administrative Settlement constituted an administrative settlement for purposes of Sections 113(f)(2) and 113 (f)(3)(B) of CERCLA, 42 U.S.C. §§ 9613(f)(2), 9613(f)(3)(B).

37.     The Administrative Settlement and the Enforcement Action Memorandum do not include remedial activities in areas downstream of the Site.  These areas include the unnamed

tributary to Little Brier Creek, Little Brier Creek, Brier Creek Reservoir, Brier Creek, and Lake Crabtree. The EPA has designated these areas as "Operable Unit 1" or "OU1." Operable Unit 1 is not the subject of this action.

38. In addition, following completion of the Removal Action, supplemental activities will likely be conducted at the Site. These supplemental activities may include further investigations, reports, a groundwater study, and any additional remedial actions EPA determines are necessary. The EPA has designated these supplemental activities as "Operable Unit 2" or "OU2." Operable Unit 2 is not the subject of this action.

39. In March 2007, PCS Phosphate Company ("PCS") agreed to participate in the Response Actions.

40. PEC, along with Consol, Bassett, and PCS, executed the First Amended Ward Transformer Site Trust Agreement (the "Trust Agreement") creating the Ward Transformer Site Trust Fund (the "Trust"). The Trust is the mechanism by which the Response Actions required by the Administrative Settlement are funded. By agreement, PEC has made financial contributions to the Trust for purposes of complying with its requirements under the Administrative Settlement. As of the date of this Complaint, PEC has paid approximately $9.1 million to the Trust as required by the Trust Agreement and the Administrative Settlement.

41. By agreement, Bassett, PEC, and Consol each have the right to pursue claims versus one another and all other PRPs. All recoveries go to the Trust to fund the Removal Action and to reimburse the signatories to the Trust Agreement as appropriate and as allowed by applicable law.

42. The removal activities required by the Administrative Settlement began in late 2005, and excavation work began in August 2007 (the "Removal Action"). As of August 31st,

1064442-1

2008, approximately 41,000 tons of < 50 ppm contaminated soil had been shipped off-site to a landfill for disposal, and approximately 45,000 tons of > 50 ppm contaminated soil was stockpiled at the Site awaiting treatment to remove PCBs.  The decontamination process has begun and is treating approximately 35 tons of soil per hour.  Approximately 36,500 tons of soil have been treated.  The transformer repair building was dismantled and shipped off-site for disposal, along with other materials.  Using all available data, the current estimate of contaminated soil that must be excavated at the Site is expected to exceed 300,000 tons.  Under current schedules, the Removal Action is scheduled to be completed in June or July 2009.

43.     Plaintiff has incurred costs and damages, including attorneys' fees, in the course of performing the requirements of the Administrative Settlement, including the Removal Action. These costs constitute "necessary costs of response" that were incurred consistent with the National Contingency Plan ("NCP"), within the meaning of Section 107(a) and Section 101(25) of CERCLA, 42 U.S.C. §§ 9607(a) and 9601(25), respectively, (collectively, the "Response Costs").

44.     Plaintiff anticipates that pursuant to the Administrative Settlement it will be required to incur additional "necessary costs of response," as outlined above, including reimbursement to the EPA for its administrative and oversight costs in the future (collectively "Future Response Costs") in connection with the Site.

**JURISDICTION AND VENUE**

45.     This action arises under CERCLA, as amended, 42 U.S.C. §§ 9601-9675 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

46.     This Court has subject-matter jurisdiction over Plaintiff's claims brought under CERCLA pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1331.  The Court has further

authority to adjudicate this matter and to declare the respective rights, duties, and obligations of the parties pursuant to 42 U.S.C. § 9613(f)(1) and 28 U.S.C. § 2201.

47.     Venue is proper in the Eastern District of North Carolina under Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), and under 28 U.S.C. § 1391(b) because the releases or threatened releases of hazardous substances alleged herein occurred, and the claims set forth herein arose, in this District at the Site located in Wake County, North Carolina.

## PARTIES

### A.     The Plaintiff

48.     Plaintiff Carolina Power & Light Company d/b/a Progress Energy Carolinas, Inc. ("PEC") is a corporation organized and existing under the laws of the State of North Carolina with its principal place of business in Raleigh, Wake County, North Carolina.  Plaintiff has incurred and will in the future incur response costs and has otherwise performed and is performing removal actions at the Site, and is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

### B.     Defendants

49.     Defendants are "persons" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21) who by contract, agreement, or otherwise arranged for disposal or treatment of hazardous substances owned or possessed by them or another party or entity at the Site, as described herein.

50.     The general factual allegations with respect to each Defendant are based upon the Ward records.  Some of these records were produced by Ward to EPA and obtained by Plaintiff from EPA.  Other records were obtained directly by the Trust parties from Ward.  The database of Ward records, presently, is approximately 87,000 pages.  Based on a thorough evaluation of

the Ward records, each Defendant is liable to Plaintiff based on the following facts and circumstances, among others that may arise during the course of this litigation:

(1.)    Records indicate that **Union Electric** sent at least 14 transformers containing PCBs to the Ward site.  Records further indicate that Ward removed and replaced the old oil in at least one (1) of these transformers.  Upon information and belief, **Ameren Corporation** is successor-in-interest to Union Electric and/or bears responsibility for the environmental liabilities of Union Electric.

(2.)    Records indicate that **American Electric Corporation** sent at least six (6) transformers containing PCBs to the Ward site between 1977 and 1981.  Ward rewound at least two (2) of these transformers.

(3.)    Records indicate that the **Town of Blackstone, Virginia**, sent at least two (2) transformers containing PCBs to the Ward Facility.  Both transformers were completely rebuilt while at the Ward Facility, which entailed removing the oil, among other repairs.  One transformer was in a "faulty" and inoperable condition when it arrived at the Ward Facility.

(4.)    Records indicate that **Bonner Electric, Inc**., sent at least six (6) transformers containing PCBs to the Ward Facility.  Three (3) of these transformers underwent extensive repairs while at Ward, and three of them received oil changes in which the old, PCB-tainted oil was removed.

(5.)    Records indicate that **Pittsburgh & Midway Coal Mining Company**, either directly or through one (1) or more agents, sent at least two (2) transformers containing PCBs to the Ward Facility. Upon information and belief, one (1) of these transformers was a PCB-Contaminated transformer with a concentration of 110 ppm

PCBs. Upon information and belief, **Chevron Mining, Inc.**, is the successor-in-interest to Pittsburgh & Midway Coal Mining Company.

(6.) Records indicate **Cohen and Green Salvage Company, Inc**., sent at least seven (7) transformers to the Ward Facility in 1981. Upon information and belief, these transformers contained PCBs. Three (3) of these transformers were completely rebuilt by Ward, and the rest were scrapped. Some of the transformers arrived at the Ward Facility in poor condition requiring substantial repairs, including repair or replacement of bushings and other components. Ward removed and disposed of the old oil in these transformers.

(7.) Records indicate that **SMI Steel** sent at least two (2) transformers containing PCBs to the Ward Facility. Records indicate that one (1) of the transformers was repaired and rebuilt, which involved rewinding the coils, removing and disposing of the old oil, and replacing the old oil with new oil. Records indicate that another transformer arrived at the Site in such poor condition that it was scrapped by Ward ultimately. Upon information and belief, **Owen Electric Steel Company of South Carolina**, and/or **SMI-Owen Steel Company, Inc.**, and/or **SMI Steel d/b/a CMC Steel South Carolina, an Alabama corporation operating a steel plant in Cayce, South Carolina**, and/or **Commercial Metals Company** are successors-in-interest to, or are responsible for the environmental liabilities of, SMI Steel.

(8.) Records indicate that **ABEX Friction Products Division of ABEX Inc.** sent two (2) transformers to the Ward Facility. Upon information and belief, both of these transformers contained PCBs. The first transformer was sent to Ward in 1978, and documents from the transaction describe the transformer as "a used and damaged G.E.

2500 KVA transformer . . . ." The second transformer was sent to the Ward Facility for repairs. Records indicate that this transformer had to be rewound. Upon information and belief, **Cooper Industries, Inc.**, bears responsibility for the environmental liabilities of ABEX Friction Products Division of ABEX Inc.

*(9.)* Records indicate that **Cotter Electric Company** sent over 300 transformers to the Ward Facility. Upon information and belief, most of these transformers contained PCBs and some were PCB-Contaminated ($\geq$ 50 and < 500 ppm). Records indicate that some of the transformers were leaking when they arrived at the Ward Facility and others were scrapped by Ward. Several of the transformers arrived at the Ward Facility inoperable or in poor condition requiring substantial repairs and new oil. Cotter Electric Company requested that Ward rewind and rebuild some of the transformers.

*(10.)* Records indicate that the **City of Dover, Delaware**, sent at least six (6) transformers to the Ward facility that contained PCBs. Upon information and belief, some of the transformers arrived at the Ward Facility in poor condition and required substantial repairs. At least four (4) of the transformers were inoperable and rewound. At least one of the transformers was leaking when it arrived at the Ward Facility. Upon information and belief, Ward removed and replaced the old oil in all of the transformers.

*(11.)* Records indicate that **Endicott Clay Products Company** sent at least one (1) transformer to the Ward Facility that contained PCBs. The transformer arrived at the Ward Facility in poor condition and Endicott Clay Products Company requested that Ward remove and dispose of the old oil and replace the bushings.

(12.)    Upon information and belief, **Hagerstown Light Department**, either directly or through one or more agents, sent at least three (3) transformers containing PCBs to the Ward Facility in 1975.  Ward performed substantial repair work on at least two (2) of the transformers at the Site, including rewinding the coils and replacing the oil.

(13.)    Records indicate that **Huntsville Utilities** sent at least four (4) transformers and an oil circuit breaker to the Ward Facility in 1975 and 1980.  Upon information and belief, most of this equipment contained PCBs.  At least one (1) of these transformers remained at the Ward Facility for nearly 25 years, and upon information and belief, this transformer was scrapped by Ward.

(14.)    Records indicate that **Jet Electric Motor Co., Inc**., sent at least 18 transformers containing PCBs to the Ward Facility.  These transformers were either repaired, rebuilt, or scrapped at the Ward Facility.  At least two (2) of these transformers were PCB-Contaminated with PCB concentrations greater than 50 ppm.  Some of these transformers arrived at the Ward Facility in poor condition requiring significant repairs, including rewinding and rebuilding of the transformers.

(15.)    Records indicate that **Kelly Electrical** sent at least two (2) transformers containing PCBs to the Ward Facility.  At least one of the transformers was completely rewound and rebuilt.  Upon information and belief, **John E. Kelly & Sons Electrical Construction, Inc., and/or Kelly Generator & Equipment, Inc., and/or Kelly Electrical Construction, Inc.**, is the successor-in-interest and/or is responsible for the environmental liabilities of Kelly Electrical**.**

(16.)    Records indicate that **Genstar Stone Products Company** ("Genstar") sent at least one (1) transformer containing PCBs to the Ward Facility.  Ward's records

state that when the unit arrived at the Ward Facility, the oil was slightly burnt. Records further indicate that Genstar requested a complete remanufacture of the transformer, which required Ward to rewind the coils and remove and replace the old oil, among other repairs. Upon information and belief, **Lafarge Mid-Atlantic, Inc.**, and/or **Lafarge Mid-Atlantic, LLC**, and/or **Redland Genstar** are successors-in-interest and/or responsible for the environmental liabilities of Genstar.

(*17.*) Records indicate that **Lewis Electric Supply Co., Inc.**, sent at least five (5) transformers containing PCBs to the Ward Facility. At least one (1) of these transformers was scrapped after approximately 12 years at the Ward Facility, while another unit received substantial repairs, namely rewinding. Ward removed and replaced the old oil in the remaining three (3) units.

(*18.*) Records indicate that the **City of Mascoutah, Illinois**, sent at least three (3) transformers to the Ward Facility. Upon information and belief, these transformers contained PCBs. Upon information and belief, these transformers arrived in poor condition at the Ward Facility and at least one of these transformers was leaking. At least one (1) of these transformers required substantial repairs before being sold.

(*19.*) Records indicate that **M-P Electrical Contractors, Inc.,** sent at least one (1) transformer containing PCBs to the Ward facility. Ward's records further indicate that there was water in the transformer, so it was baked out for eight (8) days. Ward also removed and replaced the old oil in this transformer.

(*20.*) Records indicate that **New Southern of Rocky Mount, Inc.**, sent at least three (3) transformers to the Ward Facility. Upon information and belief, at least two (2) of the transformers were PCB-contaminated ($\leq 50$ and $< 500$ ppm) and one (1) contained

PCBs. Records indicate that the transformers arrived at the Ward Facility in poor condition and required substantial repairs. All three (3) transformers were rewound and at least one (1) of the transformers was un-tanked, flushed and filled with new oil. The original oil for one (1) of the transformers arrived in drums.

(21.) Records indicate the **North Carolina State Fair**, a division of the **North Carolina Department of Agriculture and Consumer Services**, sent at least five (5) transformers to the Ward Facility. Upon information and belief, these transformers contained PCBs. At least one (1) of these transformers arrived in faulty and inoperable condition requiring substantial repairs, and the North Carolina State Fair gave it to Ward for trade-in or salvage credit. Ward eventually rewound and rebuilt the transformer and removed and replaced the old oil before selling it to another customer.

(22.) Records indicate that **P.C. Campana, Inc.,** sent at least one (1) transformer containing PCBs to the Ward Facility. Ward's records further indicate that Ward removed and replaced the transformer's old oil.

(23.) Records indicate that **Plasma Energy Company** ("Plasma Energy") sent at least three (3) transformers and other equipment containing PCBs to the Ward Facility. Each of these units initially was sent to the Ward Facility for repair and then sent back years later for resale. Upon information and belief, substantial repair work was done to the units, including rewinding, regasketing, installing new bushings, and removing and replacing the old oil. Records further indicate that Ward scrapped these units about ten (10) years after they were sent back for resale, and that these units were very rusty when they arrived back at the Ward Facility. Upon information and belief, **Phoenix Solutions**

1064442-1

**Company** is the successor-in-interest to or is responsible for the environmental liabilities of Plasma Energy.

(24.) Records indicate that **Surry-Yadkin Electric Membership Corporation** sent at least one (1) transformer to the Ward Facility on two (2) occasions. Upon information and belief, this transformer contained PCBs. Upon information and belief, this transformer arrived at the Ward Facility the first time in poor condition requiring substantial repairs. Ward rewound and rebuilt the transformer and removed and replaced the old oil.

(25.) Records indicate that **Tennessee Associated Electric, Inc.,** sent at least one (1) transformer containing PCBs to the Ward Facility. This transformer arrived in poor condition requiring substantial repairs, and Ward eventually scrapped this transformer. Upon information and belief, Tennessee Associated Electric, Inc., may also be known as **Tennessee Associated Electric Holdings, Inc.**

(26.) Records indicate that **Ventech Equipment**, either directly or through an agent, sent at least six (6) transformers containing PCBs to the Ward Facility in 1984. These transformers either underwent oil changes, extensive repairs, or rebuilding, all of which required the old oil to be removed. Upon information and belief, most of the transformers remained at the Ward Facility for several years. Upon information and belief, **Ventech Engineers, Inc.,** and/or **Ventech Process Equipment, Inc.,** and/or **Ventech Equipment, Inc.,** and/or the **Ventech Companies** are successors-in-interest and/or responsible for the environmental liabilities of Ventech Equipment.

(27.) Records indicate that **Montenay Power Corporation n/k/a Veolia Environmental Services Waste-to-Energy,** sent at least three (3) transformers to the

Ward Facility. Upon information and belief, all three (3) transformers contained PCBs. Records indicate that at least one (1) transformer was leaking and all were in poor condition when they arrived at the Ward Facility. Ward performed many significant repairs on these transformers, including replacing bushings and rewinding. In addition, the transformers required that the existing oil be removed and disposed of by Ward and the transformers were filled with new oil. Upon information and belief, **Veolia Environnement SA** and **Veolia Environmental Services** are the successors-in-interest to and/or are responsible for the environmental liabilities of Montenay Power Corporation.

(*28.*) Records indicate that **W.R. Schofield Construction Co., Inc.,** sent at least one (1) transformer containing PCBs to the Ward Facility. Records further indicate that the transformer arrived at the Ward Facility in poor exterior condition and needing repairs and/or reconditioning. Additionally, Ward's records show that Ward removed and replaced the old oil.

## COUNT I

## CLAIM FOR NECESSARY COSTS OF RESPONSE AGAINST ALL DEFENDANTS PURSUANT TO SECTION 107 OF CERCLA

51. The allegations of Paragraphs 1 through 50 of this Complaint are incorporated by reference as if fully set forth herein.

52. Plaintiff is a "person" within the meaning of Section 101(21), CERCLA, 42 U.S.C. § 9601(21).

53. Each Defendant is a "person" within the meaning of Sections 101(21) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(21) and 9607(a).

54. The Ward Facility is a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9). At the time of Ward's operations and the releases that occurred, as alleged above, the Ward Facility contained buildings, structures, installations, equipment, piping, a lagoon or impoundment, ditches, storage containers, and other materials in support of its operations as a transformer repair, reconditioning, resale, and servicing facility.

55. The soils, waterways, fish, and other natural resources in and around the Ward site constitute the "environment" as defined by Section 101(8) of CERCLA, 42 U.S.C. § 9601(8).

56. PCBs are a "hazardous substance" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

57. The activities conducted at the Ward Facility caused one or more "releases" or "threatened releases" as defined by Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), including, but not limited to, spills, leaks, or drips of transformer oil contaminated with PCBs into the soils, sediments, and surface water pathways at the Site.

58. Defendants are liable under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3) as, or as successors-in-interest to, persons who by contract, agreement or otherwise, arranged for the disposal or treatment, or arranged with a transporter for transport for disposal or treatment of hazardous substances owned or possessed by them or by another party or entity, at the Site. Each Defendant or its agent(s) caused PCBs and electrical equipment containing PCBs to be delivered to the Ward Facility and to be repaired, reconditioned, or otherwise serviced by Ward at the Ward Facility. The repairs, reconditioning, or other services caused spills, leaks, or drips of oil containing PCBs at the Site. The conduct in which each Defendant or its agent(s)

engaged constitutes an arrangement for disposal or treatment or constitutes an arrangement with a transporter for transport for disposal or treatment of hazardous substances.

59.     The releases or threatened release of hazardous substances at the Site has caused and will continue to cause Plaintiff to incur necessary costs of response consistent with the National Contingency Plan, within the meaning of Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), including without limitation the Response Costs Plaintiff has paid to the Trust to fund the Removal Action and the Future Response Costs that Plaintiff will pay to the Trust.  In funding the Removal Action, the Trust has paid and will continue to pay contractors and consultants for their services of, among other things, surveying the Site, sampling the soils and other resources, delineating the scope of work, excavating soils, treating soils, and related administrative and oversight activities.

60.     The Response Costs and Future Response Costs that Plaintiff has incurred and will continue to incur are and will be consistent with the National Contingency Plan, as described in 42 U.S.C. § 9605 and 40 C.F.R. Part 300.

61.     Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Defendants are jointly and severally liable for Response Costs incurred and Future Response Costs to be incurred in connection with the Site.

62.     Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Defendants are liable to Plaintiff for the Response Costs incurred and Future Response Costs to be incurred by Plaintiff in connection with the Site, and Plaintiff is entitled to recover from each Defendant for its Response Costs incurred and Future Response Costs to be incurred with regard to the Site.

63.     Plaintiff is additionally entitled to a declaratory judgment of each Defendant's joint and several liability with regard to all Response Costs and Future Response Costs for the Ward Transformer Superfund Site.

## COUNT II

### CONTRIBUTION CLAIM AGAINST ALL DEFENDANTS PURSUANT TO SECTION 113 OF CERCLA

64.     The allegations of Paragraphs 1 through 63 of this Complaint are incorporated by reference as if fully set forth herein.

65.     Plaintiff is a "person" within the meaning of Section 101(21), CERCLA, 42 U.S.C. § 9601(21).

66.     Each Defendant is a "person" within the meaning of Sections 101(21) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(21) and 9607(a).

67.     The Ward Facility is a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).   At the time of Ward's operations and the releases that occurred, as alleged above, the Ward Facility contained  buildings, structures, installations, equipment, piping, a lagoon or impoundment, ditches, storage containers, and other materials in support of its operations as a transformer repair, reconditioning, resale, and servicing facility.

68.     The soils, waterways, fish, and other natural resources in and around the Ward site constitute the "environment" as defined by Section 101(8) of CERCLA, 42 U.S.C. § 9601(8).

69.     PCBs are a "hazardous substance" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

70.     The activities conducted at the Ward Facility caused one or more "releases" or "threatened releases" as defined by Section 101(22) of CERCLA, 42 U.S.C. § 9601(22),

including, but not limited to, spills, leaks, or drips of transformer oil contaminated with PCBs into the soils, sediments, and surface water pathways at the Site.

71.     Defendants are liable under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3) as persons who by contract, agreement or otherwise, arranged for the disposal or treatment, or arranged with a transporter for transport for disposal or treatment of hazardous substances owned or possessed by them or by another party or entity, at the Site, or as successor-in-interest to such persons.  Each Defendant or its agent(s) caused PCBs and electrical equipment containing PCBs to be delivered to the Ward Facility and to be repaired, reconditioned, or otherwise serviced by Ward at the Ward Facility.  The repairs, reconditioning, or other services caused spills, leaks, or drips of a dielectric fluid or oil containing PCBs at the Site.  The conduct in which each Defendant or its agent(s) engaged constitutes an arrangement for disposal or treatment or constitutes an arrangement with a transporter for transport for disposal or treatment of hazardous substances.

72.     The Administrative Settlement relating to the Site constitutes an "administrative or judicially approved settlement" within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).  In the Administrative Settlement, Plaintiff has resolved its liability to the United States for some or all of the response action or some or all of the costs of the response action pertaining to the Site.

73.     The releases or threatened release of hazardous substances at the Site has caused and will continue to cause Plaintiff to incur necessary costs of response consistent with the national contingency plan, within the meaning of Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), including without limitation the funds that Plaintiff has paid to the Trust to fund the Removal Action and the funds Plaintiff has paid to reimburse EPA's response costs with

regard to the Site, as it was required to do under the Administrative Settlement. In funding the Removal Action, the Trust has paid and will continue to pay contractors and consultants for their services of, among other things, surveying the Site, sampling the soils and other resources, delineating the scope of work, excavating soils, treating soils, and related administrative and oversight activities.

74. No Defendant, other than the Settling Parties, are parties to the Administrative Settlement, and no Defendant, other than the Settling Parties, has resolved its liability to the United States with regard to the Site in an administrative or judicially approved settlement.

75. Pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), Defendants are liable to Plaintiff in contribution for all of Plaintiff's damages and costs under the Administrative Settlement, including Response Costs, Future Response Costs, and the amounts Plaintiff has paid and will pay to reimburse the EPA for EPA's response costs, administrative costs, and oversight costs, as well as for any other recoverable costs

76. Pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), Plaintiff is entitled to contribution from Defendants for Response Costs incurred and for Future Response Costs to be incurred and for amounts paid or to be paid to EPA by Plaintiff in connection with the Site, and to an allocation by the Court of all of Plaintiff's recoverable costs and damages among Plaintiff and Defendants using such equitable factors as the Court determines are appropriate.

WHEREFORE, Plaintiff demands judgment in its favor against each of the Defendants, as follows:

(a)     Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a),

(i)     Adjudging, decreeing, and declaring that each Defendant is jointly and severally liable pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for Response Costs incurred thus far in connection with the Site, for Future Response Costs to be incurred in connection with the Site, and any other recoverable costs, together with interest thereon; and

(ii)    Ordering Defendants to pay Plaintiff for Response Costs related to the Site incurred to date, for all Future Response Costs to be incurred in connection with the Site, and any other recoverable costs, together with interest thereon, computed in accordance with Section 107(a) of CERCLA, 42 U.S.C. § 9607(a); and

(b)     Pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B),

(i)     Adjudging, decreeing, and declaring that Defendants are liable pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), for contribution to Plaintiff for the Response Costs, the Future Response Costs, including without limitation all amounts paid or to be paid to the EPA, and for any other recoverable costs, together with interest thereon; and

(ii)    Allocating responsibility for the Response Costs, the Future Response Costs, including without limitation all amounts paid or to be paid to the EPA, and for any other recoverable costs, among Plaintiff and Defendants pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), using such equitable factors as the Court determines are appropriate; and

(iii)   Ordering Defendants to provide contribution to Plaintiff for the Response Costs, the Future Response Costs, including without limitation all amounts paid or to be

paid to the EPA, together with interest thereon, and for any other recoverable costs, computed in accordance with Section 107(a) of CERCLA, 42 U.S.C. § 9607(a); and

(c)     Ordering Defendants to pay Plaintiff its costs of this action, including reasonable attorneys' fees; and

(d)     Granting Plaintiff such other, further, and different relief as the Court may deem just and appropriate.

This 12th day of September, 2008.

SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, L.L.P.

By:   /s/ Caroline N. Belk
            Christopher G. Smith
              N.C. State Bar No. 22767
            Caroline N. Belk
              N.C. State Bar No. 32574
            P.O. Box 2611
            Raleigh, North Carolina 27602
            Telephone:     (919) 821-1220
            Fax (919) 821-6800
            Email: csmith@smithlaw.com
            Email: cbelk@smithlaw.com

            *Attorneys for Plaintiff Carolina Power & Light Company d/b/a Progress Energy Carolinas, Inc.*