IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:08-CV-460-FL

| | |
|---|---|
| CAROLINA POWER & LIGHT COMPANY d/b/a PROGRESS ENERGY CAROLINAS, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| 3M COMPANY, et al., | ) ) ) **ORDER** |
| Defendants. | ) |

No. 5:08-CV-463-FL

| | |
|---|---|
| CONSOLIDATION COAL COMPANY, | ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| 3M COMPANY, et al., | ) ) |
| Defendants. | ) |

These cases come before the court on motion of defendants Danny Corporation, Northrop Grumman Shipbuilding, Inc., Pharmacia Corporation, Southland Electrical Supply, Inc., and Unimin Corporation (collectively, "moving defendants") for partial summary judgment on *de micromis* grounds (460 DE # 589; 463 DE # 584), filed August 26, 2011. Plaintiffs, Consolidation Coal Company ("Consol") and Carolina Power & Light Company d/b/a Progress Energy Carolinas, Inc. ("PEC"), and crossclaim plaintiff, PCS Phosphate Company, Inc. ("PCS Phosphate") (collectively, "claimants"), responded in opposition on September 19, 2011. Moving defendants replied October 6, 2011, and the court denied claimants' motion for leave to file sur-reply. In this posture, the issues raised are ripe for adjudication. For the following reasons, moving defendants' motion is denied.

**STATEMENT OF THE CASE**

The court's order dated March 24, 2010, contained a detailed statement of the case, which section the court incorporates here. For ease of reference, the court provides the following brief summary.

Plaintiffs PEC and Consol initiated these actions under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601-9675. Plaintiffs entered into an administrative settlement with the United States Environmental Protection Agency ("EPA") in 2005, which obligates them to perform removal actions at the Ward Transformer Superfund Site ("Ward Site") and to reimburse the EPA for its own removal costs related to the site. Plaintiffs seek contribution toward these same costs pursuant to § 113(f), 42 U.S.C. § 9613(f).[1] Cross-claimant PCS Phosphate, though not a party to the administrative settlement, entered into a trust agreement with plaintiffs and has contributed to funding the removal action. PCS Phosphate therefore brings a § 107(a) cost recovery crossclaim against each of the moving defendants. See 42 U.S.C. § 9607(a); see also United States v. Atlantic Research Corp., 551 U.S. 128, 139 (2007).

Plaintiffs filed their consolidated amended complaints against all defendants on September 1, 2009. PCS Phosphate counterclaimed against plaintiffs and cross-claimed against other defendants on September 15, 2009. Claimants allege that defendants sent electrical transformers to the Ward Site. These transformers allegedly contained dielectric fluids that were used as an insulating and cooling medium. In turn, the dielectric fluid allegedly contained polychlorinated biphenyls ("PCBs"). Claimants identify three groups of defendants: (1) those who sent transformers

---

[1] Plaintiffs PEC and Consol originally sought recovery of and/or contribution toward these costs under §§ 107(a) and 113(f). However, by orders entered March 24, 2010 and September 8, 2010, plaintiffs' § 107(a) cost recovery claims were dismissed.

to the Ward Site for *repairs* and for the purpose of disposing of PCBs contained therein or some part thereof; (2) those who sent transformers to the Ward Site on *consignment* and for the purpose of disposing of the transformers and/or PCBs contained therein or some portion thereof; and (3) those who *sold* transformers to Ward with the intent to dispose of such transformers and/or the PCBs contained therein or some portion thereof. Claimants maintain that the repair and consignment defendants are liable under 42 U.S.C. §§ 9607(a)(2) and (3), while the sale defendants are liable only under § 9607(a)(3).[2]

On October 13, 2009, defendants moved to dismiss the amended complaints and cross-claims. Defendants filed a single omnibus motion pursuant to Rule 12(b)(6) for failure to state a claim for relief, which motion was supplemented by individual defendants or groups of defendants filing additional motions to dismiss on alternative grounds where appropriate. By order entered March 24, 2010, the court denied defendants' omnibus motion to dismiss. Claimants were allowed to proceed on their past owner liability and arranger liability claims. However, the court granted certain defendants' motion to dismiss plaintiffs' § 107(a) cost recovery claims, finding that response costs incurred pursuant to an administrative settlement with the United States are recoverable only under § 113(f).[3] Finally, the court ruled on several motions to dismiss particular to individual defendants.

---

[2] Section 9607(a)(2) makes liable "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). Section 9607(a)(3) makes liable "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3).

[3] The parties subsequently stipulated, in consent order dated September 8, 2010, that plaintiffs' § 107(a) cost recovery claims as to the remaining defendants were also dismissed (although cross-claimant PCS Phosphate's § 107(a) cost recovery claims were unaffected).

On August 26, 2011, moving defendants filed the instant motion for partial summary judgment on *de micromis* grounds. Moving defendants are Northrop Grumman Shipbuilding, Inc. ("Northrop Grumman"), Pharmacia Corporation ("Pharmacia"), and Unimin Corporation ("Unimin") (collectively, "repair defendants"), against whom claimants assert both past owner and arranger liability claims, as well as defendants Danny Corporation and Southland Electrical Supply, Inc. ("Southland") (collectively, "sale defendants"), against whom claimants assert only arranger liability claims. Moving defendants argue that there is no genuine issue of fact or law that they qualify for CERCLA's *de micromis* exemption.

**STATEMENT OF UNDISPUTED FACTS**

The following statement focuses particularly on transactions between the moving defendants and Ward. The parties have attached as exhibits to their memoranda various Ward records relating to the transactions at issue. Where these transactions date back as far as the 1970s, the records are often incomplete and difficult to navigate.

It is undisputed that three of the five moving defendants sent at least one transformer each to Ward for *repair*. Defendant Northrop Grumman, formerly known as Ingalls Shipbuilding, Inc. ("Ingalls"), sent a transformer with serial number 18562 to Ward for repair in 1978. Ward order sheet number 225565 connects Ingalls to the transformer with serial number 18562 and indicates the transaction was for a "repair job." The order sheet describes the repair work as a "rewind to original specs," "complete with new oil."

Defendant Pharmacia, formerly known as Monsanto, sent two transformers to Ward for repair, one in 1993 (serial number E-694087) and one in 1995 (serial number 13358). Defendant

4

Unimin sent transformers to Ward for repair in 1991 and 1993. Correspondence and Ward records attached as exhibits identify the two transformers, with serial numbers C762347 and T-3159.

The remaining moving defendants, Danny Corporation and Southland, *sold* transformers to Ward. Danny Corporation, formerly known as Suisman & Blumenthal ("S&B"), "sold and shipped five transformers to the Ward Transformer Site in 1982." Eugene Klein Aff. ¶ 9.[4] But the parties have only identified Ward records related to one of these transformers, with serial number 3439819. The records indicate that this transformer had a PCB level of 10 parts per million ("ppm"), but they also state that the transformer had been "drained and flushed." An inventory sheet further indicates that the transformer's tank and fillings weighed 11,450 pounds, its core and coil 5,600 pounds.

In 1981, S&B instituted a new corporate policy in response to the EPA's PCB regulations. Under this policy, S&B would no longer accept transformers, capacitors, hydraulic systems, heat transfer systems, or oil switches with a PCB level over 500 ppm. Further, S&B would require its customers to test the oil in such units, determine the PCB level, and completely drain the oil before delivering the unit to S&B. If some oil remained upon delivery, S&B would complete draining and return the oil to the customer for disposal. Finally, S&B's policy stated: "If draining not properly done (more than 10% of total), unit might be returned to customer, at their cost for completion of draining operation."

Defendant Southland sold one used transformer to Ward in February, 1994. Ward records identify a transformer received from Southland with serial number 4301-65, weighing approximately 9000 pounds. An inventory card for the transformer contains a question mark in the fill-in box for

---

[4] Defendants aver in their statement of undisputed facts that Danny Corporation "[a]llegedly sold four used transformers to Ward in July and August 1982." However, the affidavit of Eugene Klein, former Vice President of S&B, confirms that S&B sold *five* transformers to Ward in 1982. Eugene Klein Aff. ¶ 9.

5

gallons of oil, as well as a comment, "no weights or gals of oil shown." Yet a different record related to the same transformer includes the notation "about 350 gal" for the entry, "GALLONS." Former Ward Employee Frank Aguirre testified in deposition that Ward employees would write "no oil" or "empty" if they found no oil in a transformer.

Finally, former Ward employees Aguirre and Richard Brewer testified that oil-filled transformers, even once drained, would likely still contain residual oil. See, e.g., Aguirre Tr. 57:13-20 (noting that it is "just about impossible to get all the oil out of a transformer. When they say residual, if they take the oil out, you've got oil in the coils, it's going to sit there and drip and drop, and by the time it gets to them – let's say Pennsylvania to North Carolina, you're going to have a little more oil built up on that, residual oil, what they call it."). See also Brewer Tr. 54:8 -55:9.

## DISCUSSION

A.    Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

B. Analysis

Moving defendants maintain that there is no genuine dispute of fact or law that they qualify for the statutory exemption from liability for *de micromis* parties under 42 U.S.C. § 9607(o), which subsection provides in relevant part:

> Except as provided in paragraph (2), a person shall not be liable, with respect to response costs at a facility on the National Priorities List, under this chapter if liability is based solely on paragraph (3) or (4) of subsection (a), and the person, except as provided in paragraph (4) of this subsection, can demonstrate that –
> (A) the total amount of the material containing hazardous substances that the person arranged for disposal or treatment of . . . at the facility was less than 110 gallons of liquid materials or less than 200 pounds of solid materials (or such greater or lesser amounts as the Administrator may determine by regulation); and
> (B) all or part of the disposal, treatment, or transport concerned occurred before April 1, 2001.

42 U.S.C. § 9607(o)(1).

Four requirements must be met here to establish the *de micromis* exemption. First, the concerned facility must be on the National Priorities List. Second, each defendant's alleged liability must be based *solely* on paragraph (3) or (4) of § 9607(a). Third, the total amount of material containing hazardous substances that the defendant arranged for disposal or treatment of must be less than 110 gallons of liquid materials or less than 200 pounds of solid materials. Finally, all or part of the disposal, treatment, or transport concerned must have occurred before April 1, 2001.[5]

The parties do not dispute that the bookend requirements, numbers one and four, are satisfied. But claimants contend that defendants Northrop Grumman, Pharmacia, and Unimin (the

---

[5] The parties disagree as to who carries the burden of proof under the *de micromis* exemption. Where plaintiffs bring a contribution claim pursuant to 42 U.S.C. § 9613(f), plaintiffs have the burden of proving that defendants do not qualify for the *de micromis* exemption. See 42 U.S.C. § 9607(o)(4). However, PCS Phosphate brings a § 107(a) cost recovery claim, and defendants therefore bear the burden with respect to PCS Phosphate of demonstrating that they satisfy the exemption requirements. 42 U.S.C. § 9607(o)(1).

7

"repair defendants") do not satisfy the second requirement, because they are sued under paragraphs (2) *and* (3) of § 9607(a), not solely under the latter. Claimants further argue that all moving defendants cannot satisfy the third requirement because each arranged for disposal or treatment of 110 gallons or more of liquid materials and/or 200 pounds or more of sold materials containing hazardous substances.

The court first confronts below the issue of whether the repair defendants may qualify for the *de micromis* exemption. Second, the court examines whether an issue of material fact remains in dispute as to whether the sale defendants arranged for disposal or treatment of less than 110 gallons of liquid material or 200 pounds of solid material containing hazardous substances.

1. Repair Defendants

The *de micromis* exemption is available only to those persons whose liability is based "solely on paragraph (3) or (4)" of § 9607(a). 42 U.S.C. § 9607(o)(1). Claimants allege that defendants Northrop Grumman, Pharmacia, and Unimin sent electrical transformers to the Ward Site for repairs and are liable as "owners" under § 9607(a)(2). Where claimants' allegations against these defendants are not based solely on paragraph (3) or (4) of § 9607(a), these defendants would not appear entitled to *de micromis* exemption. Defendants contend, however, that "[claimants'] 'owner' liability claims are really ill-defined 'arranger' claims" and should be dismissed based on the policy that underlies the exemption. Yet the court, by order entered March 24, 2010, allowed claimants to pursue their claims against alleged repair defendants under § 9607(a)(2) and finds no cause now to revisit that ruling. And because the plain language of § 9607(o)(1) states without ambiguity that the *de micromis* exemption is available only to those persons sued under §§ 9607(a)(3) or (4), resort to legislative history, or the policy espoused therein, is improper. In re Sunterra Corp., 361 F.3d

8

257, 265 (4th Cir. 2004). See also Cooper Industries, Inc. v. Aviall Services, Inc., 543 U.S. 157, 167 (2004). Accordingly, the repair defendants' motion for partial summary judgment on *de micromis* grounds is DENIED.

    2.    Sale Defendants

Claimants allege that defendants Danny Corporation and Southland Electrical Supply, Inc. sold electrical transformers to Ward with the intent to dispose of the transformers and the PCBs contained therein. Claims against the sale defendants are based solely on paragraph (3) of § 9607(a). Three of the four requirements for *de micromis* exemption are therefore satisfied as to the sale defendants (as stated above, the parties acknowledge that the Ward Site is on the National Priorities List and the relevant transactions occurred prior to April 1, 2001). But satisfaction of the measurement requirement detailed in § 9607(o)(1)(A) remains contested.

Section § 9607(o)(1)(A) exempts from CERCLA liability a person who arranged for disposal or treatment of "material containing hazardous substances" if the total amount of the material "was less than 110 gallons of liquid materials or less than 200 pounds of solid materials." 42 U.S.C. § 9607(o)(1)(A). Here, the parties debate the scope of the statutory phrase "material containing hazardous substances." Claimants would interpret the phrase to encompass the sale defendants' transformers and component parts. Thus, claimants argue that if a defendant sold to Ward a transformer weighing 200 pounds or more, and the transformer had within it any trace of PCBs, the defendant would not qualify for the *de micromis* exemption. Defendants, in contrast, argue that the phrase "material containing hazardous substances" refers in these cases to the contaminated oil allegedly contained in the transformers. The weight of the transformers, defendants argue, is immaterial. They would limit the court's factual inquiry to whether each sale defendant arranged

9

for disposal or treatment of 110 gallons or more of liquid materials containing hazardous substances.

The court must determine whether an electrical transformer can accurately be considered a "material" that "contains" PCBs, the "hazardous substance" at issue here.[6] Claimants contend that the transformers sent to Ward by the sale defendants, even if drained, would contain residual oil.[7] Claimants argue:

> If the oil was originally contaminated with a measurable concentration of PCBs, then the residual oil would also contain a measurable concentration of PCBs . . . [T]hat residual oil is in the cellulosic insulating material in the coils, as a film on the non-porous surfaces on the inside of the transformer, and, over time, as it drains from the cellulosic insulating material, as a free-flowing liquid at the bottom of the transformer tank. In that circumstance, the material or waste containing the hazardous substance is the entire transformer carcass and because of the combination of liquid and solid material containing PCBs, the entire transformer carcass is the waste that is subject to the applicable disposal requirements. Thus, a Sale Defendant that arranged to dispose of such a transformer by selling it to Ward would qualify for the § 107(o) exemption only if the total weight of the transformer carcass containing PCBs was less than 200 pounds.

Pls.' Mem. 23.

---

[6] PCBs are a hazardous substance. See 40 C.F.R. 302.4(a).

[7] Claimants discuss residual oil as follows:

> Oil-filled transformers use, inter alia, mineral oil as a dielectric fluid to provide a heat transfer medium to cool the windings. Some of the mineral oil dielectric fluids used in transformers included PCBs. Before an oil-filled transformer is fully enclosed and ready to operate, it is filled with oil so that the core and coil assembly is fully immersed in the oil. The porous cellulosic insulation in the windings becomes fully saturated with the oil, and the windings, the core, and all of the other non-porous components inside the tank, including the internal walls and floor of the tank, become completely coated with oil . . .
>
> Because of the physical characteristics of mineral oil dielectric fluids, the physical characteristics of the porous and non-porous internal components of the transformer, and the design of the transformer, it is virtually impossible to drain all of the oil out of a transformer . . . A layer or film of oil remains, coating the internal surfaces of the tank, the core and coils, and the other non-porous components. Oil remains absorbed within the porous insulation and other porous components. The oil that remains in the transformer after it has been "drained" is referred to as "residual oil."

Pls.' Mem. 5-6 (internal quotations and citations omitted).

PCBs are the hazardous material at issue in this case. The PCB contamination in the surface and subsurface soils at the Ward Site, as well as in the surface water runoff, necessitated the cleanup and ultimately led to plaintiffs' settlement with the EPA. See Consol 2nd Am. Compl. 44-48; PEC 3rd Am. Compl. 20-26. PCBs were components of the dielectric fluid which was used to cool, insulate, and protect transformers' electrical components. PEC 3rd Am. Compl. 11. Thus, the dielectric fluid was the source of PCBs in the transformers, and claimants allege that the spillage of this fluid at the Ward Site is what caused the PCB contamination. PEC 3rd Am. Compl. 12-13; Consol 2nd Am. Compl. 13-14; PCS Phosphate Additional Crossclaims 3.[8] Where PCBs are the hazardous material at issue, and the dielectric fluid the alleged source of the PCBs, the court concludes that it is the volume of the oil, and not the weight of the transformers themselves, which is the relevant measurement for the *de micromis* exemption. In other words, if a sale defendant arranged for the disposal of less than 110 gallons of liquid materials containing PCBs, and the other elements of the *de micromis* exemption are satisfied, then that defendant is exempt from CERCLA liability.

The court finds support for its conclusion in the legislative history of the *de micromis* exemption, which exemption was intended in part to shield from liability people and businesses who sent "only a very small amount of waste to a site." 147 Cong. Rec. H10901 (daily ed. Dec. 19, 2001) (statement of Rep. Duncan). The liquid volume of 110 gallons was chosen specifically

---

[8] With respect to the volume of dielectric fluid involved, plaintiff PEC alleges as follows: "During a 1978 EPA inspection of the Site, EPA found approximately 7,500 gallons of PCB fluid (> 500 ppm) stored in 55-gallon drums and in an above-ground storage tank. In addition, 41 PCB transformers (> 500 ppm) stored in the backyard at the Ward Site contained 12,850 gallons of PCB fluid. In December 1983, Ward contracted for the disposal of 1,815 gallons of PCB oil (> 500 ppm). From 1984 to 2004, some 48,085 gallons of PCB oil, 86,069 gallons of PCB-Contaminated oil (≥50 ppm and < 500 ppm), and 485,778 gallons of Non-PCB oil (< 50 ppm) at the Ward Facility were disposed of." PEC 3rd Am. Compl. 16-17.

11

because it equates to two drums of waste. H.R. Rep. No. 107-70, pt. 2, at 2 (2001). This supports a finding that only the volume of the oil, not the mass of its container, is relevant. If the weight of the container were relevant, then a person who disposed of a heavy piece of machinery with just a trace of contaminated oil would face liability, though the sender of one hundred gallons of the same contaminated oil, shipped in a light container, would not.[9]

The court therefore concludes that for the purposes of this case, a sale defendant is entitled to the *de micromis* exemption if the defendant sent to Ward less than 110 gallons of dielectric fluid containing PCBs. Accordingly, the court turns to the evidence proffered by both parties to determine whether an issue of fact remains as to the volume of dielectric fluid each defendant sent to Ward.

      a.    Danny Corporation

Defendant Danny Corporation was formerly known as Suisman & Blumenthal ("S&B"), a recycling and scrap metal facility. Defs.' Reply 2. On February 23, 1981, S&B instituted a new corporate policy in response to the EPA's PCB regulations. Under its new policy, S&B would no longer accept transformers, capacitors, hydraulic systems, heat transfer systems, or oil switches with a PCB level over 500 ppm. Further, S&B would require its customers to test the oil in such units, determine the PCB level, and completely drain the oil before delivering the transformer to S&B. If some oil remained upon delivery, S&B would complete draining and return the oil to the customer for disposal. Finally, S&B's policy stated: "If draining not properly done (more than 10% of total), unit might be returned to customer, at their cost for completion of draining operation.").

---

[9] The court notes too that the solid materials referenced as examples in the legislative history – paper, chicken bones, and soiled napkins – bear no resemblance to electrical transformers. See 147 Cong. Rec. H2349 (daily ed. May 21, 2001) (statement of Rep. Gillmor).

12

In 1982, "S&B sold and shipped five transformers to the Ward Transformer Site." Id., Ex. A, Eugene Klein Aff. ¶ 9. The parties, in memoranda, have identified Ward records relating to one transformer, with serial number 3439819, that S&B sold to Ward. This record has the notation "drained & flushed," but it also indicates "10 PPM PCB." Danny Corporation argues that the former notation shows that the transformer had no oil when sold to Ward. Danny Corporation maintains that this conclusion is consistent with S&B's policy regarding PCBs. Claimants respond that the note, "10 PPM PCB," demonstrates that the transformer had residual oil with a PCB concentration of 10 ppm. Claimants further argue that S&B's policy statement supports this finding, where the policy provides that a transformer would be properly drained when less than 10% of the total oil volume remained. S&B's policy, claimants emphasize, did not require *absolute* draining.

The court cannot, on the material before it, decide conclusively whether the transformers S&B sold to Ward contained less than 110 gallons of oil. S&B's policy held that a transformer was properly drained if less than 10% of the total oil volume remained when received by S&B. Further, deposition testimony of former Ward employees Richard Brewer and Frank Aguirre suggests that transformers deemed drained would nonetheless still contain residual oil. The parties appear to agree that S&B sold either five or four transformers to Ward. As stated above, the parties have provided documentation for only one of these transformers, with serial number 3439819. No evidence has been identified as to the size of the remaining transformers or to their condition when sold to Ward. However, Ward Transformer records attached to PEC's Third Amended Complaint indicate that some of the transformers Ward handled had the capacity to hold at least 1,500 gallons of oil. If a transformer of that size were drained to 10% capacity, its volume of oil would still

13

exceed 110 gallons. A material issue of fact therefore remains in dispute: namely, whether defendant Danny Corporation arranged for the disposal of less than 110 gallons of liquid materials.

Accordingly, defendant Danny Corporation's motion for partial summary judgment on *de micromis* grounds is DENIED.

        b.        Southland Electrical Supply, Inc.

Claimants allege that defendant Southland sold one used transformer containing PCBs to the Ward Facility. Ward records identify a transformer received from Southland with serial number 4301-65. This transformer had an estimated total weight of 9000 pounds. The parties dispute whether the transformer contained any residual oil when sold to Ward. Southland points to an inventory card for the transformer and draws attention to the question mark placed in the fill-in box for gallons of oil, as well as to a comment, "no weights or gals of oil shown." Southland believes these notes demonstrate that the transformer did not contain PCB-contaminated residual oil. Claimants, in turn, interpret a different record related to the transformer, which record includes the notation "about 350 gal," as an indication that the transformer contained 350 gallons of oil when sent to Ward. Claimants direct the court to deposition testimony suggesting that Ward employees would write "no oil" or "empty" if they found no oil in a transformer.

Where a material issue of fact remains as to whether the transformer sold by Southland to Ward contained 110 gallons or more of oil, Southland's motion for partial summary judgment on *de micromis* grounds is DENIED.

**CONCLUSION**

For the foregoing reasons, moving defendants' motion for partial summary judgment on *de micromis* grounds is DENIED. Further, defendants' motion for hearing also is DENIED.

SO ORDERED, this the 30th day of March, 2012.

_____
LOUISE W. FLANAGAN
United States District Judge