IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| DUKE ENERGY PROGRESS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | **Civil Action No.: 5:08-CV-00460-FL** |
| ) | |
| 3M COMPANY, et al., ) | |
| Defendants. ) | |
| ) | |
| CONSOLIDATION COAL COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | **Civil Action No.: 5:08-CV-00463-FL** |
| ) | |
| 3M COMPANY, et al., ) | |
| ) | |
| Defendants. ) | |

**<u>Joint Memorandum of Law in Support of Defendants' GKN Driveline, Dixon Lumber
Company, Broad River Electric Cooperative, Unimin Corporation,
and Sonoco Products Company's Motions for Summary Judgment</u>**

# TABLE OF CONTENTS

**Page**

I.    Introduction ................................................................................................... 1

II.   The Applicable Legal Standards ..................................................................... 2

III.  Defendants are not CERCLA Responsible Parties ........................................... 4

    A.    Defendants are not liable as "Past Owners" under 107(a)(2) of CERCLA ........... 4

        1.    There were no Hazardous Substances in the Transformers ....................... 4

        2.    There was no Disposal ........................................................................ 10

    B.    Defendants are not liable as "Arrangers" under CERCLA 107 (a)(3) ................. 16

IV.   No Threats of Releases, or Actual Releases, of Hazardous Substances Occurred ........... 20

V.    Conclusion ..................................................................................................... 26

VI.   Appendices ..................................................................................................... 27

    A-I - Dixon Lumber Company ................................................................... 27

    A-II - GKN Driveline North America ........................................................ 31

    A-III - Unimin Corporation ..................................................................... 34

    A-IV - Sonoco Products Company ............................................................ 38

    A-V - Broad River Electric Cooperative ................................................... 43

# I.    Introduction

"Congress enacted CERCLA in response to the environmental and health risks posed by industrial pollution." *Consolidation Coal Co. v. Georgia Power Company ("GPC")*, 781 F.3d 129, 143 (4th Cir. 2015) *quoting Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). "The Act was designed to promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Id.*   This case, however, does not involve industrial polluters; it concerns a handful of Ward Transformer Sales & Service customers who, over 25-35 years ago, sent three or fewer mineral-oil-insulated electrical transformers to be repaired and returned to them in operable condition.[1]  Plaintiffs are not pursuing polluters who deserve to pay millions of dollars to clean-up Ward's property; they are pursuing five customers who sent used, useful, reusable electrical equipment to be repaired by a self-described state-of-the-art expert, environmentally-compliant service-provider.[2]

---

[1] This Joint Memorandum addresses the common facts and shared legal arguments of five Defendants which support their Motions for Summary Judgment. The facts, testimony and documents concerning each of the Defendant's individual circumstances are included in the Defendant specific appendices, attached hereto.  The history of the former Ward Transformer Sales and Service Company in Raleigh, North Carolina is recounted in numerous government and expert reports, court filings in this litigation, other reported case decisions and media reports and therefore will not be restated here. *See e.g. GPC*, 781 F.3d at 144, 146-147; *Carolina Power & Light Co. v. Alcan Aluminum Corp.* 921 F.Supp.2d 488 (E.D.N.C. 2013);  *United States v. Ward*, 676 F. 2d 94 (4th Cir. 1982); *United States v. Ward*, 618 F.Supp.2d    884    (E.D.N.C.1985);    http://www.epa.gov/superfund/sites/npl/nar1666.htm; http://www.atsdr.cdc.gov/HAC/pha/WardTransformer031405-NC/WardTransformer031405-NC.pdf.

[2] 1 Q.  And the "extra effort" is a -- is referring to
2  Ward's extra effort to comply with or exceed the
3  environmental regulations in place.
4       MR. SMITH: Object to form.
5  BY MR. REDMOND:
6 Q.  Is that correct?
7 A.  That's correct.
Exh. 13, Bob Ward III Depo., Vol. 1 (3/25/2014), 104:1-7; *accord* 76:5-25, 78:18-79:3; 79:21-25; 80:13-82:16; 83:24-85:15; 89:22-91:19; 92:14-93:12; 98:2-99:22; 100:4-24; 101:13-23; 102:1-17; 103:17-25; 104:24-105:10; 112:11-114:2; 115:1-116:2; *see also* Exh. 12, Reed Depo., (11/17/2011), 54:11-55:12; 56:12-21; 59:3-61:4; 63:11-64:17.

Just as the seller of PCB-containing used transformers did not intend for the purchaser, Ward, to dispose of hazardous substances during subsequent repairs necessary for reselling them in the sales-test-case, neither did these Ward customers intend to dispose of hazardous substances by sending their transformers to be repaired for reuse, in accordance with the Toxic Substances Control Act (TSCA) 15 U.S.C. §2601, et seq. *GPC*, 781 F.3d at 150. Defendants' compliance with TSCA in the repair context no more creates "a backdoor" to arranger liability under CERCLA than did Georgia Power's compliance in the sales-test case. *Id*.

Holding these businesses responsible for cleaning up the Ward Transformer site on this record and in light of the Fourth Circuit's decision in *GPC*, would be a clear misapplication of CERCLA. For these reasons, and for those set forth below, and in the Defendant-specific appendices, these Defendants are entitled to summary judgment.

## II.     The Applicable Legal Standards

To succeed on their claims, Plaintiffs must prove to the Court[3] that: (1) each Defendant is "...a potentially responsible person ('PRP'); (2) the site constitutes a 'facility'; (3) a 'release' or a threatened release of hazardous substances exists at the 'facility'; (4) the plaintiff has incurred costs responding to the release or threatened release of hazardous substances ('response costs'); and (5) the response costs conform to the National Contingency Plan [('NCP')]." *PCS Nitrogen, Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 167 (4th Cir. 2013); *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 356 (2d Cir. 1997). There is no dispute that the Ward Transformer Site qualifies as a CERCLA facility and no dispute that there were releases or threatened releases of hazardous substances at the Ward Site prior to 1978 (before the enactment of federal laws governing the use and disposal of certain types of transformers containing PCB

---

[3] CERCLA liability is determined by judges, not juries, because restitution and declaratory relief are equitable remedies. *Ward*, 618 F.Supp. at 913.

insulating fluids, before the arrests of the President of Ward Transformer and his son for the illegal spraying of PCB-oil along the roadsides of North Carolina, and before Ward's implementation of strict environmental compliance protocols and procedures at its Raleigh repair facility).[4]

The Court's focus for purposes of this Motion for Summary Judgment, therefore, may be limited to determining whether these Defendants qualify as CERCLA "responsible parties" and, if so, whether a release or a threatened release of hazardous substances occurred during or as a result of the repairs on their transformers which caused Plaintiffs' incurrence of clean-up costs. *See PCS Nitrogen*, 714 F.3d at 167; *ABB Indus.* 120 F.3d at 356; *Nurad, Inc. v. William E. Hooper & Sons, Co.*, 966 F.2d 837, 841 (4th Cir. 1992). Since the Court's rulings in the test cases, environmental analytical and forensic chemistry experts[5] have reviewed the evidence in the record and confirmed that there is no scientifically reliable or verifiable proof that these Defendants' transformers contained hazardous substances when they arrived for repair; nor is there evidence that disposals of hazardous waste occurred at these Defendants' transformers; and there is no evidence that releases of hazardous substances occurred at Ward as a result of the transactions that caused Plaintiffs to incur response costs.

As it did in in *GPC*, the record now before the Court reflects that "the position of [Plaintiffs] rests on speculation, not a dispute over a genuine issue of material fact;" and, therefore, Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment in favor of these Defendants. See *DVL, Inc. v. Gen. Elec. Co.*, 811 F. Supp. 2d 579,

---

[4] There is also no dispute that Plaintiffs incurred *some* NCP compliant costs responding to the release of PCBs at the site. Disputes concerning *which* costs may or may not have complied with the NCP are not currently at issue because the case is bifurcated into liability and damages phases.

[5] Expert reports from: Allen Uhler, PhD., Shahrokh Rouhani, PhD, Steven Emsbo-Mattingly, and Neil Shifrin PhD are attached as Exhibits 1, 2, 3, and 4 respectively.

599 (N.D.N.Y. 2010) (holding that circumstantial evidence was not sufficient to establish CERCLA liability at summary judgment stage, granting Defendant GE's motion for summary judgment).

### III. Defendants are not CERCLA Responsible Parties

#### A. Defendants are not liable as "Past Owners" under 107(a)(2) of CERCLA

The record does not contain any direct or circumstantial evidence from which the Court could infer that "at the time of disposal of any hazardous substance [these Defendants] owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. §9607(a)(2).

##### 1. There were no Hazardous Substances in the Transformers

When this Court denied both sides summary judgment in the repair-test-case, the Court held that there was an issue of fact about whether or not the transformers contained PCBs when they arrived at Ward. (460 Doc. 1166, at 23). The Court recognized that *if* Plaintiffs could not prove that Defendants' transformers contained PCBs when they arrived at Ward for repair, *then* Defendants could not be held liable. (*Id.* at 22). The Court determined that expert interpretation of the parties' statistical evidence and technical data was necessary for assisting in the determination of whether or not PCBs were present.

Once the discovery stay was lifted, these Defendants engaged Dr. Allen Uhler, a PhD chemist[6] with decades of practical experience and scholarly work in the fields of environmental

---

[6] Dr. Uhler is a PhD chemist with over 25 years of postgraduate and professional working experience in the field of environmental chemistry. Dr. Uhler is supremely experienced and well versed in laboratory quality assurance and quality control practices, and has strong knowledge of laboratory data review and data fitness assessments. As a practicing analytical chemist, Dr. Uhler is experienced with the implementation of standard and novel analytical methods for measurements of organic and metal contaminants, and reporting of laboratory data. He has extensive experience in the measurement of PCBs in a variety of matrices including oils, soils, water, sediments, industrial materials, and biological tissues. During his career, Dr. Uhler has authored or co-authored 150 publications and professional presentations

analytical and forensic chemistry, to analyze the nexus records[7] relied upon by Plaintiffs to claim that there were detectible levels of PCBs in these Defendants' transformers upon arrival for repair. In Dr. Uhler's view, the nexus documents contained merely "a hodge-podge of references" which included:

- no data at all
- simple hand-written notes in Wards' files
- summary data sheets (without backup) from electrical service shops or laboratories that allegedly analyzed the PCB content of transformer oil, many dated several years before the transformers allegedly arrived at Ward.

Uhler Expert Report, (attached hereto as Exh. 1).[8] Dr. Uhler's Report explains that (1) the existence of PCBs in transformer oil can only be established by scientifically valid testing using reliable methodology, and conducted by trained laboratory personnel; and (2) testing of PCBs in transformer oils must be accompanied by a properly prepared test report that lists the protocols used, documents all aspects of sample handling and analysis, and accurately states the testing results.[9] In Dr. Uhler's expert opinion, there is no evidence that any valid and traceable testing methods were used to test the oil from Defendants' transformers for PCBs, let alone, documented

---

in the realm of environmental chemistry. He currently serves on the Editorial Board of the International Journal of Environmental Forensics.

[7] The term "nexus" in CERCLA jurisprudence refers to the so-called "nexus test" for arranger liability which held that so long as there was a sufficient "nexus" between the purported arranger and the disposal of hazardous substances, then CERCLA liability could attach. However, the "nexus test" was never adopted in the Fourth Circuit, and following the decision by the United States Supreme Court in *Burlington Northern*, the cases relying upon the "nexus test" in other Circuits were declared no longer good law. *MEMC Pasadena, Inc. v. Goodgames Industrial Solutions, Inc.*, 2015 WL 6473385, at *8-9 (S.D. Tex. Oct. 27, 2015) (attached as Exh.5); *Vine Street LLC v. Borg Warner Corp.*, 776 F.3d 312, 317 (5th Cir. 2015).

[8] Uhler Rep., attached as Exh. 1 and deposition excerpts attached as Exh. 6.

[9] *Id.* These are standard scientific protocols which comport with the guidelines set forth in the Reference Manual on Scientific Evidence, Third Edition (published by the National Academy of Sciences and the Federal Judicial Center). http://www.fjc.gov/public/home.nsf/autoframe?openform&url_l=/public/home.nsf/inavgeneral?openpage&url_r=/public/home.nsf/pages/1448.

Case 5:08-cv-00460-FL   Document 1757   Filed 12/11/15   Page 7 of 53

by a reliable report.[10]  Therefore, there is no way to determine, with any degree of confidence, that transformer oil from any of the Defendants' equipment contained PCBs when they arrived for repair.[11]

> 14  Finally, I was asked to look at -- look at
> 15  data from -- from nine companies, data related to
> 16  the analysis of transformer fluid from nine
> 17  companies.
> 18  And I concluded that what -- what data was
> 19  there wasn't backed up with sufficient information
> 20  to allow me to verify or validate -- or anyone to
> 21  verify or validate that data and, therefore, the
> 22  data should be considered unreliable.

Uhler Depo. 117:14-22. Dr. Uhler testified that even where there were some "PCB" references in the documents, or a summary sheet, none included sufficient evidence that would allow a chemist to offer an opinion as to their veracity or reliability.[12]

> 13  So the summary sheet is -- you know,
> 14  that's just the cover of the book.  You want to get
> 15  in to read the book and find out whether the cover's
> 16  right or not.
>            ...
> 11  The fact that a printout looks official
> 12  and says it was carried out by a certain method
> 13  doesn't make it right or doesn't make it wrong.
> 14  It's -- until it's been verified.

Uhler Depo. 97:13-16; 99:11-14; *see also* 110:8-13 (an analytical chemist's reaction to a summary sheet is "where's the beef?"... "show me what backs up this number because it's all of those factors that contribute to any reported value"); *and* 115:6-15; 126:4-128:17. Moreover, none of the documents contained or referenced a laboratory data package which would permit an

---

[10] Uhler Rep., 3-7.

[11] *Id.*; Uhler Depo. (Exh. 6),116:16-117:22; 121:2-123:16.

[12] Uhler Rep., 8; Uhler Depo., 49:1-51:24; 53:1-54:2; 54:17-55:7.

independent review and validation of the cited data.[13]  Without that necessary back-up, PCB

references in the nexus documents were, in Dr. Uhler's opinion, unverifiable, unreliable, and

therefore are inadmissible.[14]

> 6 **Whether you're working in an environmental**
> 7 **laboratory or whether you're doing blood testing in**
> 8 **a hospital or whether you're doing quality control**
> 9 **of Cheerios in a General Mills plant, we all follow**
> 10 **the same procedures for verifying our data and**
> 11 **making the data available for verification by**
> 12 **others.  That's what analytical chemists do.**

Uhler Depo. 81:6-12. There is absolutely no evidence in the record that proper procedures for

testing were followed, let alone, documented and supportable, concerning the PCB content of oil

in any of the Defendants' transformers upon arrival at Ward.[15]

> 20 **Q.  Similarly, the use of the data that we**
> 21 **have in this case would be its use in the courtroom**
> 22 **and that's not your bailiwick, true**
> 23 **MR. REDMOND:  Objection.  Misstates**
> 24 **prior testimony.**
> 25 **A. How the data is used in the courtroom**
>                                        **104**
> 1 **certainly is not my -- my bailiwick, but my**
> 2 **expertise is to advise -- to advise on how reliable**
> 3 **that data would be, whether it's in the courtroom**
> 4 **or, more importantly, in the laboratory.**

Uhler Depo. 103:20-104:4.

Perhaps because Plaintiffs are unwilling to accept their burden of proof on this issue,

they offered David Mauro to echo Dr. Ed Walsh's testimony in the test cases, asserting that, in

general, one can predict that a given transformer "more likely than not" contained PCBs simply

based upon where and when the transformer was manufactured.  Just like Walsh, however,

---

[13] Uhler Depo. 53:1-54:2; 54:17-55:7; 69:23-70:3.

[14] *Id.*; 96:6-21.

[15] Uhler Depo. 105:13-16 ("**I don't believe that there's sufficient information to demonstrate that those data are** (for Defendants' transactions)–**that the reported values** (for PCBs) **are reliable**").

7

Mauro did not analyze these Defendants' nexus records, nor did he offer any testimony specific to these Defendants' transformers. In fact, Mauro conceded that his probability-based predictions were simply created for use as a "screening tool" and were in no way reliable for proving that there were PCBs in these Defendants' transformers when they arrived at Ward.

> 4   Q.  And isn't that what you were asked by the
> 5   plaintiffs to do, to -- you know, what happens when we
> 6   don't have a test?  Can we come up with another way to
> 7   predict what the PCB concentrations are in a particular
> 8   transformer?
> 9       MS. VANNEMAN:  Object to form.
> 10  A.  No.  I wasn't asked if you can come up with a
> 11  way to predict the PCB concentrations for certain.  I
> 12  was asked if there was a way to identify the piece of
> 13  equipment as having PCBs more likely than not.

Mauro Depo., Vol. 2, 321:4-13.

Mauro further acknowledged that the narrow focus of his opinion did not take into account the multiple times that an average transformer would be repaired and have its oil replaced during its average 40-plus year lifespan. He agreed that draining and refilling an oil-filled transformer (a/k/a/ "retrofilling") "**drastically changes what's in the transformer.**"[16] Most revealing is the fact that Mauro agreed with Dr. Uhler's opinion that the only way to know for certain if a particular transformer contained PCBs at a given point in time was to conduct the proper analytical test, and to have access to back up data to verify the results[17]

> 14  Q.  Okay.  So the only way to know for certain is
> 15  to do an analytical test, correct?
> 16      MS. VANNEMAN:  Object to form.
> 17  A.  The proper analytical test.

Mauro Depo., Vol. 2, 321:14-17.

---

[16] Mauro Depo., (attached as Exh. 7) Vol. 2, 319:22-23; *see also* 330:11-331:6 (agreed that transformers can last 30, 40, or more years and be serviced/retro filled multiple times during their lifetimes.)

[17] Mauro Depo. Vol. 2, 321:4-17; 323:9-20.

It is now clear and undisputed that the probability-driven opinions offered by Plaintiffs are not scientifically supportable as a method to demonstrate that hazardous substances were inside Defendants' transformers more than 30 years ago. Even if permissible, Mauro and Walsh's opinions were declared not "relevant or reliable" for predicting the content of Defendants' particular transformers at the time they were repaired by Ward. Defendants' rebuttal expert, Dr. Shahrokh Rouhani,[18] concluded that both of Plaintiffs' experts' opinions suffered from "a number of statistical flaws." Notably, Dr. Rouhani found that:

- Mr. Mauro's opinions were exclusively founded on biased data.
- Mr. Mauro's opinions were devoid of any credible evaluation to demonstrate the relevance of his cited results to the condition of mineral oil insulated MIO [mineral oil insulated] transformers handled at the Site.
- Mr. Mauro's opinions were based on a highly speculative interpretation of Site-specific data.
- Dr. Walsh's opinions were based on an anecdotal evaluation of select past data, devoid of even the most basic rudimentary forms of data assessment and validation.
- Dr. Walsh's opinions were devoid of any credible evaluation to demonstrate the relevance of his cited results to the condition of MIO transformers handled at the Site.

Dr. Rouhani's expert report and excerpts from his deposition testimony accompany this memorandum as exhibits.[19]

---

[18] Dr. Rouhani is an environmental scientist and professional engineer, a tenured university professor, and a consultant in environmental statistics, modeling, and data analysis. He holds a Ph.D. in Environmental Sciences (1983) and a S.M. in Environmental Engineering (1980), both from Harvard University, as well as a B.S. in Civil Engineering and B.A. in Economics from the University of California, Berkeley (1978). Dr. Rouhani has authored and co-authored numerous research publications, several invited reviews and book chapters, a compendium on applications of geostatistics in environmental and geotechnical engineering, a series of American Society for Testing and Material (ASTM) standard guides for application of geostatistics in environmental site investigations, a four volume guidance document series on background data analysis for the United States Department of the Navy (DON), and an upcoming EPA guidance document on soil cleanup strategies at CERCLA sites. Dr. Rouhani has been active in several professional societies and has served on the editorial boards of the American Geophysical Union (AGU) *Water Resources Research* and the Association for Environmental Health and Sciences (AEHS) *Environmental Forensic* Journals. He was the chair of the American Society of Civil Engineers (ASCE) National Ground Water Hydrology Committee, as well as the chair of the ASCE Task Committee on Geostatistical Techniques in Geohydrology.

[19] Dr. Rouhani's expert report is attached as Exh. 2 and his deposition excerpts are attached as Exh. 8.

Certainly, Plaintiffs' position that "more likely than not" there were PCBs in Defendants' transformers rests on speculation, not facts. Nowhere in Plaintiffs' nexus-documentation or expert testimony is there any scientifically reliable proof that the Defendants' transformers contained PCBs when they arrived at Ward for repair. Speculation and generalizations are not the equivalent of actual proof. *GPC*, 781 F.2d at 152; *Textron Inc. By & Through Homelite Div. v. Barber-Colman Co.*, 903 F. Supp. 1558, 1567 (W.D.N.C. 1995). And, conjecture is not sufficient to survive summary judgment. *GPC*, 781 F.2d at 150; *Dana Corp. v. Am. Standard, Inc.*, 866 F. Supp. 1481, 1498 (N.D. Ind. 1994) ("[T]here must be evidence … beyond a witness effectively saying that 'anything's possible', because such evidence is not sufficient to support a finding."); *Acme Printing Ink Co. v. Menard, Inc.*, 891 F. Supp. 1289, 1296-97 (E.D. Wis. 1995) (finding that a CERCLA plaintiff cannot survive summary judgment by introducing circumstantial evidence that is "too thin" and "amount[s] to little more than speculation" especially in cases brought "under statutes with broad, sweeping liability such as CERCLA").

As the Court understands, the inability to show that Defendants' transformers contained PCBs when they arrived at Ward entitles them to summary judgment. (460 Doc. 1166, at 22.)

### 2. There was no Disposal

When the Court denied summary judgment in the repair test case, it noted that even if Plaintiffs could establish that the transformers contained PCBs, they would also have to prove "the second element of previous owner liability which requires ownership of the facility *at the time* of disposal."[20] See 42 U.S.C. 9607(a)(2). CERCLA defines the term "disposal" by reference to the its statutory definition under another environmental statute known as RCRA, the

---

[20] 460 Doc. 1166, at 23.

Resource Recovery and Compliance Act, 42 U.S.C. § 6903(3). A disposal is "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." *GPC*, 781 F.3d at 148 n.6, *quoting* 42 U.S.C. § 6903(3).[21] Therefore, to be liable as a "past owner," Plaintiffs must prove that Defendants owned the transformers when they "discharged, deposited, injected, dumped, spilled, or leaked a solid or hazardous waste or placed it into or on any land or water …". *Sycamore Indus. Park Associates v. Ericsson, Inc.*, 546 F.3d 847, 851 (7th Cir. 2008).

However, it is a burden Plaintiffs cannot meet because by the time that these Defendants' transformers were repaired, it is undisputed that the Ward's repair work occurred completely within the confines of an upgraded and environmentally compliant building, the "High-bay".[22]

> 21  Q    Was there any part of that system that was
> 22         open to the environment or open to the outdoors?
> 23  A    No, no.

Reed Depo., 79:21-23. Following the test case rulings, Defendants obtained several volumes of video-taped-testimony from former Ward repair and management personnel that show, without

---

[21] Since the very purpose of repairing an electrical transformer is to extend its useful life, US EPA does not consider such activity to constitute a "disposal" at all; it considers the equipment to still be "in use." 54 Fed. Reg. 52716, 52717 (Dec. 21, 1989) (*Polychlorinated Biphenyls; Notification and Manifesting for PCB Waste Activities*). EPA also made clear that if a spill, or leak, or uncontrolled discharge of PCB-contaminated oil occurred during the repair of a transformer, and adequate cleanup measures were initiated within 48 hours, then it would not be considered to have been a "disposal." 47 Fed. Reg. 37342, at *37354 (Aug. 25, 1982) (*Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce and Use Prohibitions; Use in Electrical Equipment*).

[22] Aguirre Depo. (attached as Exh. 9), Vol. I., 22:18-23:21; 36:17-38:25; 39:10-40:25; 43:19-44:14; 52:2-6; 55:13-24; 56:2-7; 57:6-58:2; 58:10-16; 59:4-9; 60:3-25; 80:1-5; Reed Depo. (attached as Exh. 12), 44:24-45:6; 48:12-51:7; 52:5-24; 68:17-69:10; 71:10-74:12; 77:25-79:23; 94:19-95:10; 97:20-99:5; 99:18-100:8; 124:2-22; 135:6-25; 141:13-142:25; Croson Depo. (attached as Exh. 10), (5/14/2011), 128:15-24.

dispute, that CERCLA disposals simply did not occur when these Defendants' transformers were repaired inside of the High-bay. During his 2014 deposition, Ward's oil-filled transformer repair shop foreman (employed there from 1979-2006), Frank Aguirre, testified that by the time these Defendants' transformers were repaired at Ward, employees did everything in their power to insure that no drips or spills of transformer fluids occurred inside the area where repair work was conducted; and, that if drips or spills did accidentally occur, they would have consisted of non-PCB oil, which was timely cleaned up using oil absorbent materials and rags which were then disposed of in 55 gallon drums that were manifested and sent off-site to an approved environmental waste disposal facility.[23] No PCB-containing oil escaped the High-bay and threatened, or harmed, the environment during the 27 years that Mr. Aguirre ran things.

> 14  Q. Now, when you were working at Ward, you don't
> 15  remember -- you don't remember any situation where oil

---

[23] Aguirre Depo., Vol. I (2/4/2014), 37:1-25; 39:10-40:25; 43:19-44:14; 52:2-6; 55:13-56:7; 57:6-58:2; 58:10-16; 60:3-25; 80:1-5; 84:5-86:12; 87:14-88:7; 92:21-94:12; 95:3-22; 96:1-10; 98:1:21; 99:3-100:6; 101:11-102:22; 103:23-104:13; 140:15-141:16; Vol. II (2/5/2014), 580:16-22; 581:6-16; Vol. III, 601:8-603:19; 734:7-735:22; 736:11-744:14; 745:9-14; 746:1-3; Rappleyea Depo., Vol. 1 (2/11/2014), 102:17-103:3; 110:16-111:1; 124:3-25: 175:2-176:15; 177:11-22; 183:3-184:16; Vol. 2 (2/12/2014), 444:3-445:4; 445:21-447:8; 447:25448:11; 450:8-457:10; 458:23-462:3; Croson Depo. (5/14/2011), 61:17-19; 62:2-63:24; 76:20-77:14.

> 17  Q. Okay. So, based on your observation, most of
> 18  the time a repair could be successfully completed
> 19  without oil getting into the outside environment?
> 20      MR. GINSBERG: Object to the form.
> 21      MR. SMITH: Object to the form.
> 22  A. Absolutely. Absolutely
>             ...
> 5  Q. Were you aware of transformers sometimes
> 6  coming to Ward that were drained before they got there?
> 7  A. Yes.
> 8  Q. Okay. And in those instances was it even more
> 9  likely that oil would not get into the outside
> 10  environment?
> 11  A. Yeah, of course.

Croson Depo. (5/14/2011), 80:17-22; 81:5-11.

16  spilled inside the shop and then got outside the building;
17  correct?
18      MS. STORY:  Object to the form.
19      A.  Inside the shop and outside?
20      Q.  Went from inside the shop to outside the
21  building?
22      MS. STORY:  Object to the form.
23      A.  No.

···

16      Q.  If there was a drip or spill, what would you have
17      done?
18      A.  We would clean up the drip or spill.
19      Q.  Would it have ever gotten outside of the high
20      bay?
21      A.  (Inaudible.)22      MR. KIGER:  Objection to form.
23      COURT REPORTER:  I'm sorry.  Did you say I
24      don't know or no?
25      WITNESS:  I said no.

Aguirre Depo., Vol. I (2/4/2014), 87:14-88:7; 36:16-25.

Benjamin Rappleyea (employed at Ward from the 1970s-2006), was Aguirre's second-in-command in the oil-filled division at Ward. He confirmed in his 2014 deposition that Ward's goal was to prevent all leaks and to not permit oil to escape outside of the shop.[24] Mr. Rappleyea also corrected the misimpression, attributed to his previous 2010 deposition testimony concerning Plaintiffs' so-called "release pathways" theory, by clarifying that his understanding was that he was being asked in 2010 about ways oil *might* escape to the environment if you *did not* follow proper procedures.[25] He emphatically and repeatedly stated that Ward employed and followed proper procedures and that it was always their policy not to let anything leave the shop.

11  THE WITNESS:  Yes, ma'am, especially if
12  there was any PCB oil at that time, but it was --

---

[24] Rappleyea Depo., (attached as Exh. 11), Vol. 1, (2/11/2014), 102:17-103:3; 110:16-111:1; 124:3-25, 184:7-16.

[25] Rappleyea Depo., Vol. 1 (2/11/2014), 185:3-13; 186:23-187:5; 188:3-14; 191:12-23; 193:20-194:18; 196:2-20; 197:5-22; 198:5-201:22; 202:2-203:8 (It was the usual and customary practice at Ward that oil did not get outside the shop).

13

> 13  it was always policy not -- not to let anything
> 14  leave the shop.

Rappleyea Depo., Vol. 1 (2/11/2014), 188:11-14.[26]  Rappleyea, like Aguirre, also confirmed the

accuracy of Bob Ward III's statements to customers in a 2004 letter (and in his 2014 deposition)

that the company had taken extraordinary measures over the years, since 1978, to fully comply

with, if not exceed, all environmental laws and regulations.

> 13  Q.  And going back to that letter that you read to
> 14  your customers, you wrote that: "Ward Transformer has
> 15  taken extraordinary measures over the years since 1978
> 16  to fully comply with, if not exceed, all environmental
> 17  laws and regulations."
> 18  Did I read that correctly?
> 19      MR. GINSBERG:  Object to form.
> 20  THE WITNESS:  That's correct.
> 21  BY MR. REDMOND:
> 22  Q.  And that is, in fact, true; that's what Ward
> 23  was doing after '78, correct?
> 24      MR. GINSBERG:  Object to form.
> 25  THE WITNESS:  We tried.
>              ...
> 23  Q.  And as you put in your letter, Exhibit 991,
> 24  not only did you try to abide by the law, you also
> 25  exceeded the law, correct?
> 0082
>  1      MR. GINSBERG:  Object to form.
>  2  THE WITNESS:  That would be a judgment.  We
>  3  tried to do the best we could.
>  4  BY MR. REDMOND:
>  5  Q.  Okay.  Fair enough.
>  6  And by -- when you say tried to do the best
>  7  you could, that means you changed the way Ward
>  8  Transformer Company operated before 1978, correct?
>  9  A.  That's correct.

Bob Ward, III. Depo., (attached as Exh. 13), Vol. 1 (3/25/2014), 80:13-25; 81:23-82:9, *see also*

89:22-91:19; 92:14-93:12.

---

[26] Reed Depo., (attached as Exh. 12), 79:21-23; 80:22-81:10; 82:1-11 (no spills within High-bay
between at least 1986 -1992); 85:5-86:8; 86:11-87:10.

No witness ever reported seeing a drip, leak or spill of oil escape the indoor, protected, High-bay repair area during the time when these Defendants' transformers were at Ward; let alone any disposals of PCB-containing oil that occurred at/or from any particular one of Defendants' transformers.[27]  Those facts are borne out by the numerous EPA and North Carolina regulatory reports, beginning in 1978 through the 1990s, as well as by the soil sampling data connected to Plaintiffs' removal work in the mid-to-late 2000s.  The near constant governmental surveillance of Ward from 1978 onward, resulting from the roadside PCB dumping and the incarceration of Robert Ward, Jr., underscored the company's main objective was to operate in an environmentally compliant manner.

```
 2      Q.  So by 1978 to the '80 period --
 3      A.  Go ahead.  I'm sorry.
 4      Q.  -- you understood that the improper
 5   handling of PCB oil could result in criminal
 6   prosecution; is that correct?
 7      A.  That is correct.  Yes, ma'am.
 8      Q.  Okay.  And as an officer of the
 9   company, you're responsible for how the company --
10   company operates in a legally compliant manner,
11   aren't you?
12      A.  Never quite explained to me that way
13   when I agreed to be like the assistant secretary,
14   where I took the position basically just to be able
15   to sign, you know, some documents.
16      Q.  Right.
17      A.  But even beyond that, if I wasn't an
18   officer, I was still aware that -- at what had
19   taken place with Mr. Ward, Jr., so my actions, I
20   think, have been shown throughout all of this that
21   my slant was to the right, to do what was right.
22      Q.  Okay.
23      A.  And it related to transformer oil
24   and -- and what was correct and legal and proper.
```

[27] Collison Depo.,(1/4/2012) (attached as Exh. 14), 282:20-282:23, 283:11-283:16, 285:16-285:24 (admitting that there is no evidence linking a release of PCBs from any particular transformer to any cleanup costs at the Ward facility); Aguirre Depo., Vol. I (2/4/2014), 91:23-92:2 (Too many transformers to connect any specific spills to any specific transformer); 56:17-58:17; 58:24-59:20; Croson Depo., 66:17-20; 67:23-68:9; 79:5-80:6; 80:17-22.

```
          25      Q.  So if you saw something that you
          1327
          1   thought wasn't right, you would -- you would work
          2   to stop that, correct?
          3        A.  I would do my very dead level best,
          4   yes, ma'am.
```

Brewer Depo., (attached as Exh. 15) Vol. 3, part 2 (3/19/2014), 1326:2-1327:4.

Repairs of Defendants' transformers inside of the High-bay after 1977 created "no real possibility of [hazardous substances] entering the environment, as required to have a 'disposal;'" therefore, CERCLA liability cannot attach. *See Sycamore,* 546 F.3d at 852-853, *citing G.J. Leasing,* 54 F. 3d 847, 385 (7th Cir. 2008); *Covalt v. Carey Canada, Inc.,* 860 F.2d 1434, 1439 (7th Cir.1988) ("The interior of a place of employment is not 'the environment' for purposes of CERCLA"); 3550 *Stevens Creek Associates v. Barclays Bank of California,* 915 F.2d 1355,1359-60 (9th Cir. 1990). Plaintiffs offer only speculation, not facts, to support their allegations that there was a "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment ..." *GPC,* 781 F.3d at 148 n.6, *quoting* 42 U.S.C. § 6903(3). Without evidence of this essential element, Plaintiffs' claims for past-owner liability must fail.

**B.    Defendants are not liable as "Arrangers" under CERCLA 107 (a)(3)**

Even if undisputed proof of PCBs in Defendants' transformers and disposals existed, which they do not, Plaintiffs still cannot support their claims that by sending useful used electrical transformers to be repaired in compliance with TSCA, that these Defendants "arranged for disposal...of hazardous substances". 42 U.S.C. 9607(a)(3). That is especially true given the Fourth Circuit's decision in *GPC*; if the motives of a seller who, in that case, were admittedly to rid itself of PCB-laden transformers by selling them at auctions, were not sufficient to make it an

16

"arranger," then it would be absurd to hold liable these Ward customers–who at one time owned similar transformers, which Ward similarly repaired for reuse.

The only distinguishing factor between the two situations is that repair customers allegedly owned ("retained title to") the transformers from which Ward caused environmental contamination. However, even before the Fourth Circuit instructed that a party must be proven to have planned for a disposal of hazardous substances to occur in order to be found liable as an arranger, mere ownership of a piece of equipment from which a third party polluted was *never* sufficient to justify the imposition of CERCLA arranger liability. *Miami-Dade County, Fla. v. United States,* 345 F. Supp. 2d 1319 (S.D. Fla. 2004) (holding that the repair of used Air Force aircraft engines resulting in disposal of cleaning solvents was not an arrangement for disposal); *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.,* 343 F.3d 669, 679 (3d Cir.2003) (Arranger liability cannot be imposed on the basis of ownership or possession of a hazardous substance alone).

Although arguably an element to consider under the pre-*Burlington Northern* totality of the circumstances approach, "[o]wnership is merely a judicially created test factor that has little practical significance." *United States v. North Landing Line Const. Co.,* 3 F.Supp.2d 694, 702 (E.D. Va. 1998). In other words, CERCLA liability must be "based upon actual pollution, a strict liability tort"; "it is not based on a products liability model" where *but for* owning a product in need of repair, a polluting event would not have occurred. *See U.S. v. NCR* Corp., No. 10-C-910, 2015 WL G142993, at *5 (E.D. Wis. Oct. 19, 2015) (attached hereto as Exh. 30). Rather, to be held liable as arrangers, courts require that defendants had "some actual involvement in the decision to dispose of waste." *Id.* at 701; *accord Lockheed Martin Corp. v. United States,* 35 F. Supp. 3d 92, 134 (D.D.C. 2014) ("Congress was more interested in holding liable, where distinguishable, those *who disposed of* and *controlled the disposal* of hazardous

substances rather than those *who owned* them."); *Hinds Investment LLP v. Albert Angioli,* 654 F.3d 854 (9th Cir. 2011) (defendant cannot have liability unless the plaintiff proves that the defendant had a "measure of control over the waste at the time of its disposal and was otherwise actively involved in the waste disposal process."); *Heim v. Heim,* No.: 5:10–CV–03816–EJD, 2014 WL 1340063, at *10 (N.D. Cal. April 2, 2014) (attached hereto as Exh. 16) (deficiency of evidence indicating that [defendant] exercised actual control over Third–Party Plaintiff's disposal leaves no genuine dispute as to any material fact with respect to her CERCLA claim); *Veolia Es Special Services Inc., v. Hiltop Investments Inc.,* No. 3:07–0153 2010 WL 610094, at *5 (S.D. W.Va. Feb. 18, 2010) (attached hereto as Exh. 17) (Unlike the *Nurad* defendants, parties who had no ability to manage, direct, or conduct operation of the tank car at the time of the disposal cannot be found liable).

Merely sending a used transformer for customary repairs, in full compliance with existing TSCA regulations, does not equate to any actual involvement in waste disposal by Ward employees. In fact, each former Ward employee to whom questions were posed during the 2014 depositions confirmed that these five Defendants did not supervise, could not control, did not direct, and had no knowledge about Ward's practices and procedures for conducting repairs.[28] More importantly, in terms of assessing CERCLA responsibility, there is absolutely no evidence in the record that any of these Defendants instructed Ward on whether and how to remove and replace oil in their transformers. They were certainly never informed that workers might drip or spill PCB-containing oil in the course of the repair work.

> 1 **Q. Okay. And would there have been any –**
> 2 **at any time Ward would tell a customer that we**
> 3 **might drip or spill oil while we're working on your**

---

[28] The affidavit and deposition testimony specific to the claims against each of these Defendants are referenced in the Defendant specific Appendices A-I through A-V.

4  transformer?
        5  A.  No, we -- that would not be in the
        6  ordinary course that we would relay that type of
        7  information.

Brewer Depo., Vol. 3, part 2 (3/19/2014), 1324:1-7.  There is also no basis to conclude that these

Defendants controlled Ward's work or instructed Ward about how to handle leakage or disposal

of oil.

        12  Q.  Not to use too broad an example, but you didn't
        13  have the customer in the shop saying do this, do that,
        14  etc.; right?  That was your job?
        15  A.  That was just Ward's.
        16      MS. STORY:  Object to the form.
        17  Q.  Right.  So the decision minute to minute as to
        18  how to rebuild and recondition a transformer, that was
        19  where your expertise came in; correct?
        20  A.  Yes.
                    ...
        22  Q.  Okay.  And the customer wasn't supervising each
        23  little detail of what happened?
        24  A.  No.
                    ...
        7  Q.  Sure.  So to use an analogy to an automobile
        8  mechanic, the customer drives in the car and says I need
        9  my brakes changed.  They leave the car with you guys, and
        10  you would change the brakes.  How you physically change
        11  the brakes was up to you.  Is that a good analogy?
        12  A.  Yes.

Aguirre Depo., Vol. I (2/4/2014), 151:12-152:12.

        6      BY MS. FEDDER:
        7      Q.  And would -- in the normal course of --
        8      of Ward's operation, would customers supervise
        9      and -- and tell Ward what to do, you know,
        10     precisely on how to make repairs to their
        11     transformers?
        12     MR. SMITH:  Objection to form.
        13     THE WITNESS:  No, ma'am.

Brewer Depo., Vol. 3, part 2 (3/19/2014), 1321:7-13.

        Q.      And in that -- in those instances,
        2       would -- would the customer provide instructions

```
 3      on -- to Ward on how to go about doing that?
 4      A.  No, they couldn't -- wouldn't tell us
 5  how to do it.  We would just -- that would be what
 6  they want.
 7      Q.  Right.
 8      A.  They wouldn't tell us how to do it.
 9      Q.  Right.  It's like if I took my -- I
10  don't know about you and cars, but if I took my car
11  into a mechanic and said, you know, I hear this
12  sound, find out what's wrong, and they call me back
13  and they tell me what the sound is and then they
14  say, by the way, you need XYZ, you know,
15  maintenance, you know, do you want to pay for that?
16  And I would say, yes, if that's what your
17  recommendation is.
18          Is it a similar process when a customer
19  would send a transformer to Ward for repair?
20      A.  Yes.
```

Croson Depo., (2/19/2014), 238:1-20; *see also* Croson Depo., (5/14/2011), 53:7-55:8. There is certainly no evidence in the record to suggest that these Defendants played any role at all in Ward's decisions about compliance with environmental regulations.

Nowhere in the "nexus" records or testimony is there any basis upon which to infer that any of these Defendants intended to dispose of hazardous waste by sending their transformers to Ward; their purpose was to have the equipment repaired and returned to them for reuse. They cannot, as a matter of law, be held liable as CERCLA arrangers.

## IV.  No Threats of Releases, or Actual Releases, of Hazardous Substances Occurred

Even if Plaintiffs could prove all of the other necessary elements of CERCLA past owner or arranger liability, they still lack any evidence showing a release or threatened release of PCBs occurred at the site, during or following Ward's repairs of the transformers at issue.[29]  Since the test-case rulings, Plaintiffs have not come forward with any new or scientifically reliable

---

[29] 460 Doc. 1166, at 23.

evidence or expert opinions that support their claims that releases of PCBs occurred after 1977 at Ward, let alone that they caused the need for a cleanup.

The Defendants, on the other hand, engaged expert Dr. Neil Shifrin who examined the record and provided a detailed report,[30] and deposition testimony, explaining that the PCB contamination that created a need for remediation at the Site occurred long before these Defendants ever transacted with Ward Transformer. Dr. Shifrin, and his team, conducted an exhaustive analysis of the testimony and the documents in the record; resulting in his issuance of an expert opinion concluding that Ward Transformer's oil handling practices before 1978 caused PCB contamination at the Site. However, beginning by 1978, Ward had upgraded its operations related to the handling of oil-filled equipment such that subsequent regulatory oversight (detailed in multiple USEPA and NCDNER reports) showed that PCB releases had been terminated at the Site. The dramatic change was attributable to Ward disposing of all waste materials (*e.g.*, fluids, rags, items, *etc.*) off-site at licensed disposal facilities and documenting such disposals on thousands of pages of hazardous waste manifests in the record.

> 6  Q. Sure. Just as background, and I think you
> 7  mentioned this in your report, the policies, the oil
> 8  handling policies and the spill control policies
> 9  that were adopted circa 1978 were in response, among
> 10  other things, to the jailing and imprisonment of the
> 11  CEO of Ward, correct?
> 12       MR. GINSBERG: Object to form.
> 13  A. Right. Among other things.
> 14  Q. And, in fact, is it your understanding
> 15  that this company, Robert Ward's father, the
> 16  president, was investigated by the North Carolina
> 17  Department of Environmental Protection and the EPA
> 18  and ultimately went to prison for violating PCB
> 19  handling rules?

---

[30] Exh. 4, Expert Report of Dr. Neil Shifrin; Exh. 18, Expert Rebuttal Report of Dr. Shifrin. Dr. Shifrin, holds a Ph.D. in Environmental and Civil Engineering from M.I.T. as well as a Bachelors in Science in Chemistry from University of Pennsylvania. He has more than 43 years' experience specializing in the transport and fate of chemicals, including PCBs, in the environment.

20          MR. GINSBERG: Object to form.
21  A. Yes.
22  Q. And the fact that this immediate tangible
23  exercise of governmental authority related to PCB
24  handling may have had an affect on the diligence of
25  the other Ward employees?
                      193
1          MR. GINSBERG: Object to form. Vague.
2  Leading.
3  A. I believe that there's deposition
4  testimony by the employees to that effect and then
5  there's -- I believe there's a quote from Ward, III,
6  that said that they viewed that the operations were
7  under a microscope, meaning -- meaning close
8  scrutiny by the agencies.
9  Q. Sure. And, specifically, the "operations"
10  being the oil handling policies?
11  A. Right.

Shifrin Depo., (attached at Exh. 19) 192:2-193:11. The upgraded procedures employed by Ward

included: (1) PCB transformers (>500 ppm) were no longer accepted; (2) Customers were

required to test for PCB content prior to sending their transformers to Ward. If PCB levels were

between 50 ppm and 500 ppm, the customer was required to drain the fluids prior to shipment;

and (3) improved Ward practices, including employee training, leak scrutiny, tank dikes, spill

cleanup protocols and equipment, transferring fluids in an enclosed manner, and water run-off

treatment under an NPDES permit.[31]

Dr. Shifrin also provided an Expert Rebuttal Report in response to Plaintiffs' remedial

manager Gary Collison's opinions about on-going releases of PCBs occurring unabated at the

site until 2005.[32] Dr. Shifrin agreed with Collison that PCB contamination occurred over an

extended period of time at Ward, but he disagreed that the period of time extended beyond 1977-

---

[31] Exh. 4, Shifrin Rep. at 10-14.

[32] Exh. 18, Shifrin Rebuttal Rep. at 1-2.

78, based upon the changes and upgrades at the Site (about which Collison admitted having no knowledge).[33]

> 10    Q. Page 26 of your report in 4.2 you say,
> 11  "In 1978 the Ward facility made major changes to PCB
> 12  handling practices that most likely eliminated any
> 13  further releases. These upgrades, as outlined in
> 14  Ward's 1979 spill plan, including" et cetera, et
> 15  cetera.
> 16        You use the date "1978" in the first
> 17  sentence and you talk about the "1979" plan. What
> 18  happened in 1978 that prevented releases?
> 19    A. The changes in PCB handling procedures.
> 20    Q. And for that you rely on Mr. Ward's
> 21  testimony?
> 22    A. Well, now I've told you three times the
> 23  documents I relied on for that. I can tell you a
> 24  fourth time.

Shifrin Depo., 144:10-24.

In addition to Dr. Shifrin, Defendants retained Steven Emsbo-Mattingly, an environmental forensic chemist,[34] who analyzed all of the PCB data collected as part of Plaintiffs' removal work at Ward, along with PCB data in NCDENR reports and EPA reports from prior years, and concluded that the spatial distribution of contamination at the Site showed

---

[33] Collison admitted that Plaintiffs never told him about, nor had he read, any of the pre-2001 EPA reports, NCDNER reports, Ward's regulatory compliance filings, Bob Ward's 2004 letter to customers or Messrs.' Reed, Ward or Croson's deposition testimony. Exh. 14, Collison Depo., (1/4/2012), 186:23-187:25, 214:2-12, 225:11-226:7, 232:7-11, 242:3-6, 245:3-7, 257:18-24, 259:12-261:3, 262:16-263:12, 263:22-264:18, 265:7-271:2, 273:7-15, 275:5-276:5, 276:14-20, 277:17-279:8.

[34] Emsbo-Mattingly has over 25 years of postgraduate and professional working experience in the field of environmental chemistry. He is an expert in the transformer manufacturing process and has worked extensively with the analysis of PCBs in a variety of settings, including releases from transformers. He holds a Master's of Science in Environmental Science from the University of Massachusetts. Mr. Emsbo-Mattingly directed organic and inorganic laboratories for more than 10 years and performed several hundred forensic investigations concerning chlorinated organic compounds, hydrocarbons, and heavy metals throughout the United States under contract with USEPA, NOAA, various State agencies, and numerous private companies. He has authored or co-authored over 100 professional publications and presentations, including textbook chapters concerning the environmental forensics aspects of chemical source identification and interpretation that are relevant to his work in this case. Mr. Emsbo-Mattingly also serves on the Editorial Board of the *International Journal of Environmental Forensics*.

that it related primarily, if not wholly, to releases that occurred before 1978.[35] He emphasized

that the soil-sampling data and reports he reviewed indicated that significant releases of PCB-

containing transformer fluids occurred on-site before 1978; but that the concentration of PCB

releases found in the soil samples declined significantly by 1978, due to the implementation of

environmental control procedures by Ward (e.g., transformer fluid testing prior to arrival, spill

response upgrades, storm water control systems, and offsite disposal of PCB-contaminated

fluids).

31

```
 1   ... so my opinion is based on –
 2   essentially on the chemistry and the fact that when
 3   you look at contamination of the kind that we see at
 4   a site like this, you have to -- you know, if you
 5   are doing source identification and you're trying to
 6   figure out whether materials were released before or
 7   after a date, you have to take in the fact that an
 8   integrated system, which includes the components
 9   that I've enumerated on Page 3, was -- was, again,
10   effective at minimizing and eliminating the PCBs.
11        What is important to understand is that
12   prior to this time, two things are in place. One is
13   prior to 1978, there were no -- first of all, there
14   was no regulatory oversight -- no regulatory
15   involvement on the site.
16   The dates in which the operations occurred
17   were consistent with dates in which PCB transformer
18   fluids were still being manufactured and used
19   readily in the environment, readily in the industry,
20   and a system like the one that I've outlined here on
21   3 were not in place.
```

Emsbo-Mattingly Depo. (attached as Exh. 20), 31:1-21. Emsbo-Mattingly detailed the well-

recognized forensic methods used for identifying the date of manufacture of PCB-containing

transformer fluids from examining soil samples. He explained how this methodology requires

measurement of trichlorobenzenes, tetrachlorobenzenes, and scavengers and testified that those

---

[35] Emsbo-Mattingly Expert Rebuttal Rep. (Exh. 3)

types of "critical measurements"[36] are nowhere to be found in the record. The cleanup at the site is over, the soil samples were not retained, and it is too late to reconstruct them now.[37] Therefore, no forensic chemist can date the PCBs identified in the samples relied upon by Collison and his opinion that PCB fluids continued to be released after 1978 is not supported by any actual data.[38]

Emsbo-Mattingly's expert report and deposition testimony explained how the Ward site history, spatial distribution of PCBs in the soil samples, and the testimony about improved equipment and oil handling practices at Ward (after the arrest and conviction of Ward's President for the road-side spraying) all supported the conclusion that the PCB contamination at the Ward site was attributable to PCB handling and releases before 1978.

                                            37
    13    Q. And I'm asking you for the basis for that.
    14    A.  Because prior to 1978, there was little to
    15   no regulatory oversight. The -- the manufacturing
    16   practices for transformers did not have restrictions
    17   on the presence or absence of PCBs, so the
    18   transformers, themselves, to the extent that they
    19   would have had PCB-laden fluids, they would
    20   certainly have not had any restrictions, other than
    21   perhaps financial, for having them in there.


                        ...


                                            61
    1    A.  What I mean is that the transformers that
    2   were repaired and restored on site are not -- there
    3   is no evidence that I see that the activities
    4   associated with the repair and restoration of
    5   transformers after 1978 would have released, that is
    6   to say, let PCBs go into the environment in an

---

[36] Because historical samples were not been properly archived by regulators and Plaintiffs for supplemental testing, and the historical contamination has largely been remediated, it is no longer possible to perform supplemental testing. Exh. 3, Emsbo-Mattingly Rep. at 6.

[37] *Id.*, at 6.

[38] *Id.*, at 7.

7 uncontrolled way.
8    Q.   Okay.
9    A.   Relative to what was going -- you have to
10   remember that prior to 1978, in the absence of these
11   controls, the weight of evidence is that the
12   releases would have disproportionately, if not
13   totally occurred prior to 1978.

Emsbo-Mattingly Depo., 37:13-21; 61:1-13.

There is simply no supportable science showing that releases or threats of releases of

PCBs occurred during the time period, or following, when these Defendants' transformers were

repaired at Ward's facility.[39]

## V.    Conclusion

Defendants are not the intended targets of CERCLA liability. There is no proof that

they owned hazardous substances, that they disposed of hazardous substances, or that any of

them knew that Ward employees could accidentally drip or spill oil, let alone oil contaminated

with PCBs, during repairs of transformers. Even if there were such evidence, the fact that there

is no proof that Defendants planned for any such releases to occur during Ward's repair work

and had no authority or ability to prevent such releases from occurring, negates any CERCLA

responsibility. Indeed, Defendants simply (and legally) sent useful, used transformers for repair

and reuse – there were no arrangements for the disposal of hazardous substances and Defendants

are entitled to entry of summary judgment.

---

[39] Emsbo-Mattingly's report (and excerpts from his deposition testimony) are attached hereto and are offered in rebuttal to the 2011 and 2014 opinions and 2010 deposition testimony of Plaintiffs' remediation consultant Gary Collison (who opined in the that he presumed release of PCBs occurred unabated at Ward during its entire 40 years of operations based upon the fact that he was unaware of any of the environmental compliance protocols and procedures put in place beginning in the late 1970s, *see infra* n. 33).

# VI.    Appendices

## A-1
### Dixon Lumber Company's Appendix to the
### Joint Memorandum of Law in Support of Summary Judgment

The attenuated connection between Dixon Lumber Company and the Ward facility arises

from a single transaction which, according to the nexus documents, was initiated between Ward

Transformer and a man named Jason Burkhart of Vortex Engineering, around March 19, 1987.[40]

From Ward's records, it appears that the transaction involved two drained 30,000 pound

substation transformers (serial numbers C-860320B and C-860320A); and, although the nexus

records do not provide any clear indication of what actually transpired, it appears that Ward's

work on the two units began in September 1987, but was not finished until 1990.[41] During

discovery, three former Ward employees testified that their reading of the nexus records showed

that the two transformers arrived at Ward already drained.[42] The employees also confirmed that

the handwritten, scribbled, references in the nexus documents to gallons of oil disposed of in

connection with the repairs, at best, reflected the combined amount of Ward's own oil which it

would have used to flush the empty tanks during their repair, *plus* some unknown quantity of

residual oil that may have been inside of the drained tanks when they arrived.[43]    Importantly, the

total amount of oil that may have been associated with Ward's repair work was recorded on a

shipping manifest, documenting that all of it was accounted for and shipped off-site to a licensed

---

[40] A-019167-75; A-019177-84; WT026078-84; EPA-WCR 00018012-15, (Attached as Exh. 21)

[41] WT026073-75; EPA-WCR 00018017, (Attached as Exh. 22); Croson Depo (2/19/2014), 271:24-273:16; (See Exh. 10) Garner Depo., 51:21-54:1, (Attached as Exh. 23).

[42] Aguirre Depo. (2/6/2014), 730:9-731:2 (See Exh. 9); Croson Depo (2/19/2014) 270:10-24; Rappleyea Depo. (2/12/2014), 439:7-440:22; 447:25-448:11; 450:1-6 (See Exh. 11).

[43] Aguirre Depo., 730:9-731:2; 731:20-733:6; 733:11-734:5 (See Exh. 9); Croson Depo. (2/19/2014), 243:7-244:3 (See Exh. 10).

disposal facility.[44] Ward employee deposition testimony and Dr. Uhler's Expert Report also confirmed that there are no certified or other laboratory test results in the nexus documents showing any pre-repair PCB content in the transformers upon arrival at Ward.[45]

Susie Dixon Garner, the current President of Dixon Lumber Company, testified that her father (Dixon Lumber Company's co-founder) died in early 1990 and the company then sold off its wood processing/manufacturing facility and all of its assets in 1997.[46] The facility was located just down the road, and visible, from the family home in Galax, Virginia. Mrs. Garner recalled that during the 1980s, her father had become concerned about the high cost of electricity necessary to run the plant, so he looked into acquiring, installing, and operating an electrical power plant to run the wood manufacturing business in Galax.[47] Unfortunately, Mr. Dixon died in early 1990 and the Company never installed or operated its own power plant.[48]

As far as the single transaction at issue, there were no invoices or correspondence in Dixon's records reflecting any dealings whatsoever with Ward or Vortex Engineering, let alone about the purchase/repair of the transformers.[49] No family members or former Dixon employees recalled ever seeing two 30,000 pound substation transformers located at the Galax plant. Mrs. Garner surmised that the entity identified in the nexus records as having interacted with Ward, Vortex Engineering, may have arranged for the repair of the transformers in order to sell them to

---

[44] G000306-309; G000323 (Attached as Exh. 24); Aguirre Depo., 731:20-25; 733:3-734:5 (See Exh. 9); Rappleyea Depo., 450:1-7 (See Exh. 11).

[45] Croson Depo., 269:18-270 (See Exh. 10); Exh. 1, Uhler Rep., at 2 and 4.

[46] Garner Depo., 17:14-21 (Attached as Exh. 23); Garner Affidavit (11/24/2014), ¶ 5 (Attached as Exh. 25).

[47] Garner Depo., 29:11-30:15 (See Exh. 23).

[48] Garner Depo., 30:10-15; Garner Aff. ¶ 7.

[49] Garner Depo., 24:11-25:10; 35:9-25.

Mr. Dixon for the power plant.[50] Neither of the transformers at issue were listed as assets in the 1997 sale[51] and there is no record or recollection of them specifically, or of any transformers of that size, ever being located on company property.[52]

The nexus records confirm that Ward dealt with Jason Burkhart from Vortex Engineering about the transformers in 1987 and again in 1990 concerning picking up the units from Ward.[53] No Jason Burkhart ever worked for Dixon Lumber and the exchange "828" for the telephone numbers listed on Plaintiffs' records for Mr. Burkhart and Vortex Engineering are not exchanges that covered Galax, Virginia during that time period (236,728, & 773).[54] Mrs. Garner testified that all of the information gleaned from the nexus records confirms her belief that the transformers were never owned by, used by, or located at Dixon Lumber Co.[55] And, notably, even if there were evidence of Dixon's ownership of the units and the presence of PCB oil in the units upon arrival at Ward, the nexus documents reflect that they were empty and not leaking upon arrival at Ward and that the total amount of oil that was supposedly utilized during the repair work was put into a container and shipped to a disposal site in Georgia.[56] Plaintiffs' nexus documents provide a perfect paper trail showing that the numbers of gallons removed from the transformers at issue were all accounted for and properly disposed of off-site.[57]

In addition, Ward employees confirmed that the handwritten instructions on the repair card were from the Ward salesperson to the Ward repair people; the customer would not have

---

[50] Garner Depo., 51:21-53:18; Garner Aff. ¶¶ 6-7.

[51] Garner Aff. ¶ 5. (See Exh. 25)

[52] Garner Aff. ¶ 7; Garner Depo. 35:9-25

[53] Garner Aff. ¶ 6; A-019167; A-019174 (Exh. 21); WT026073-75 (Exh. 22).

[54] Garner Depo., 51:21-53:18; Garner Aff. ¶ 6

[55] Garner Aff. ¶¶ 4-7

[56] *Id.* at ¶ 8; G000306-309; G000323. (Exh. 24)

[57] Garner Aff. ¶ 8

provided any such detailed instructions nor would it have controlled or supervised Ward's repair work.[58] There is no question that any repair work performed was completed wholly inside of the High-bay Building at Ward and would not have posed a threat of release or actual release of PCBs into the environment.[59]

What facts do exist are undisputed: (1) the transformers were empty when they arrived at Ward, (2) there are no PCB test reports or other measure of scientifically reliable, verifiable, evidence that the transformers contained PCBs when they arrived at Ward, (3) there is a paper trail showing off-site disposal of all of the oil used by Ward in connection to the repair work, (4) Ward directed and controlled the repair work, not Dixon or Vortex, (5) the transformers were never located at Dixon's plant, and (6) they were not among the assets when the plant was sold. Plaintiffs should not be permitted to proceed any further in their speculative claims against Dixon Lumber Company.

---

[58] Croson Depo. (2/19/2014), 271:5-23; Rappleyea Depo. (2/12/2014), 439:25-440:22.
[59] Aguirre Depo., 734:7-746:3; Rappleyea Depo., 456:1-460:25.

**A-II**
**GKN Driveline's Appendix to the Joint Memorandum of Law**
**in Support of Summary Judgment**

GKN Driveline, headquartered in Auburn Hills Michigan, develops, builds and supplies an extensive range of automotive driveline components for global consumers.[60] Two of its production facilities are located in North Carolina, near the former Ward Transformer facility. Beginning in the mid-1980s through 2001, GKN purchased several transformers from Ward Transformer, as well as returned several to Ward for repair.[61] GKN used the transformers to help power their Mebane and Sanford, North Carolina plants. The relationship between the two businesses was simply that of customer and service provider.

Plaintiffs originally sued GKN in 2009 based upon Ward customer records which supposedly reflected six repair transactions, which Plaintiffs alleged involved the disposal of hazardous substances. However, during discovery, former Ward employee Marvin Croson confirmed that four of the six transformers at issue were not insulated with any type of oil at all.[62] The two other units at issue were twin Siemens-Allis transformers 95016-7 and 95016-8 that were manufactured together in 1979, without PCBs.[63] The nexus documents suggest that the transformer with serial number 95016-7 was repaired by Ward in September 1988[64] and that unit 95016-8 was repaired by Ward thirteen years later, in August 2001.[65] Following the close of

---

[60] http://www.gkn.com/driveline/about-us/Pages/default.aspx (Attached as Exh. 26).

[61] Croson Depo. (2/19/2014), 227:21-228:11 (See Exh. 10).

[62] Three of the transformers targeted by Plaintiffs were dry-types and one was water-cooled, so none contained any oil at all. Croson Depo. (2/19/2014), 229:9-232:12 (See Exh. 10).

[63] http://www.nj.gov/drbc/library/documents/PMP_Resources/Guidelines_PCBtransformers.pdf; (Attached as Exh. 27).

[64] WT026863-868, A-011923-24, EPA00005608-10 (Attached as Exh. 28).

[65] WT031579; E017820-824, WT031589-90, WT031593-97; A-011048-49; EPA-WCR00005597-98; E018421-22; E018430, 33-34 (Attached as Exh. 29).

discovery, Plaintiffs dropped the 2001 transaction, based upon a non-detect PCB test result, as well as the four involving non-oil containing transformers, from their targeted allocation list.

Plaintiffs' claims against GKN are now based solely on a single 1988 repair transaction involving one of the "twin" transformers, serial number 95016-7. Plaintiffs contend that copies of three documents, connected to the later **2001** repair of the other twin, serial number **95016-8,** support their claim that serial number **95016-7** had a small PCB concentration when it arrived at Ward thirteen years earlier. One of the documents Plaintiffs rely upon is a copy of an August 7, 2001 fax sheet, from a Mr. Patterson of SETA-AC to Richard Brewer at Ward, enclosing what are referred to "data sheets from July **1998**". [66] Significantly, neither the fax cover sheet, nor the attached data sheets, reference GKN at all; nor do they identify any transformer by manufacturer name.[67] And, notably, the PCB values identified in the nexus records for the 2001 repairs to unit **95016-8**, reflect three different PCB values for that unit alone: "Dexil 8-7-2001 > 50, cert. later N.D. < 1 8-10-2001",[68] "3.4"[69] and "< 1"[70]. Those different values, especially the two widely divergent ones showing a PCB concentration greater than 50 ppm on August 7th compared to a non-detect result three days later, on August 10th,[71] illustrate well Dr. Uhler's expert opinion and Mr. Mauro's confirmatory deposition testimony, that the only way to know for certain if there were detectible levels of PCBs in transformer oil at a certain point in time is by conducting a scientifically reliable analytic test, backed up by verifiable results. Jt. Memo, at pp. 4-9.

---

[66] WT031593 (See Exh. 29).

[67] WT031594-595 (See Exh. 29).

[68] A-011048 (See Exh. 29).

[69] WT031595 (See Exh. 29).

[70] WT031597 (See Exh. 29).

[71] A-011048 "Dexil 8-7-2001 > 50, cert. later N.D. < 1 8-10-2001" (See Exh. 29).

The bottom line is that there is nothing in the nexus documents or elsewhere concerning Ward's repair of transformer s/n 95016-7 to support a conclusion that it contained hazardous substances when it arrived at Ward in 1988. Even if there were some scientifically reliable and verifiable evidence that unit 95016-7 contained a detectible level of PCBs at some point in time, there is no dispute that it was considered to be a "non-PCB" (<50 ppm) unit when it arrived at Ward.[72] That fact is a significant indication that GKN and Ward were both operating well within the regulations governing transformer repairs, and were not engaged in some nefarious industrial pollution scheme. *GPC*, 781 F.3d at 150 ("Compliance with the TSCA does not create a backdoor arranger liability factor under CERCLA.").

In fact, there is nothing in the nexus records connected to the 1988 repair that suggests that GKN was informed that oil in the unit would be removed and replaced whatsoever, let alone any evidence to support an inference that GKN knew that Ward employees might accidentally and incidentally drip or spill oil during their repairs of the transformers. Nor is there any indication that transformer 95016-7 was leaking oil at the time it arrived at Ward. Importantly, the transformer was still useful for its intended purpose–the transformation of voltages–given the evidence in the record that 95016-7 was returned to GKN and put back into use. Most informative is the fact that former Ward employee Marvin Croson, who recalled having worked with GKN as a customer over many years, confirmed that GKN never provided instructions to Ward or supervised or controlled any aspect of any repair in any way, shape, or form.[73] Plaintiffs should not be permitted to proceed any further in their speculative claims against GKN. For these reasons, and those set forth in the Joint Memorandum of Law, GKN is entitled to entry of summary judgment in its favor.

---

[72] Croson Depo., (2/19/2014), 233:17-234:3 (See Exh. 10).

[73] *Id.*, at 236:3-17; 236:24-238:20.

**A-III**
**Unimin Corporation's Appendix to the**
**Joint Memorandum of Law in Support of Summary Judgment**

Unimin Corporation is North America's leading industrial mineral producer of silica, high purity quartz, feldspar, nepheline syenite, calcium carbonate, clay, kaolin, lime and limestone products. It is headquartered in Connecticut and has facilities nationwide, including in North Carolina. Like co-defendant GKN, Unimin transacted with Ward Transformer over a period of several years, purchasing transformers from Ward, renting transformers, and returning them to Ward for periodic and routine repairs. Absolutely nothing in Ward's or Unimin's records suggest that Unimin transacted with Ward for the purpose of disposing of hazardous waste or that any such waste was disposed of in connection to the transactions. In fact, long before the transactions at issue occurred, Unimin had undertaken and implemented procedures to insure that none of its plants in North Carolina had electrical transformers containing PCBs.[74] Nonetheless, Plaintiffs singled out three transactions involving repairs to Unimin transformers serial numbers C762347, H525679, and T-3159.

**Transformer C762347** arrived at Ward in March 1991 from Unimin's Spruce Pine North Carolina plant. Unimin's records show that following an internal, non-PCB compliance, audit in September, 1988, all of the oil-filled equipment at the Spruce Pine plant was non-PCB.[75] Nonetheless, Plaintiffs contend that a pre-audit, 1986, cover sheet proves that the unit arrived in 1991 with a PCB concentration of 12 ppm.[76] While there are additional conflicting ppm values recorded in handwritten notations in the nexus packet, as well as a discrepancy about the prefix

---

[74] Unimin-Ward 00001-11; Unimin-Ward 00023-41 (Attached as Exh. 31).

[75] Unimin-Ward 00001-8 (see Exh. 31).

[76] WT028516 (Attached as Exh. 32).

in the serial number[77], there is nothing remotely approaching the type of scientifically reliable proof, explained by Dr. Uhler, as necessary to establish that there were any PCBs in transformer C762347 when it arrived for repair at Ward.[78]

**Transformer H525679**. According to the nexus documents, Ward originally *sold* transformer H525679 to Unimin in May 1999 as a non-PCB transformer.[79] Ward, in turn, had purchased the unit from competitor and former defendant T&R Electric Supply Co. as a mineral oil, non-pcb transformer.[80] Unbelievably, Plaintiffs contend that by returning the transformer to Ward just months later for what was undisputedly a warranty repair,[81] Unimin should somehow be deemed responsible for contaminating Ward's facility.

**Transformer T-3159**. The final transaction at issue, involved a repair to transformer T-3159 from Unimin's Marston, North Carolina facility in 1993.[82] The Marston plant had conducted an internal PCB audit in 1987, which had identified unit T-3159 as non-PCB.[83] In fact, by 1991, Unimin had further documented its extensive retro-filling and non-PCB compliance program.[84] Plaintiffs, however, contend that a cover sheet for a test performed on a sample supposedly from T-3159 tested on **September 30**, 1993, proves that the transformer had 11 ppm of PCBs when it arrived at Ward on **July 31**, 1993. The problem with that theory is that

---

[77] See Exh. 10, Croson Depo. (2/19/2014) 246:23-249:1; Losee Depo.,128:8-129:17 (Attached as Exh. 33).

[78] Exh. 1, Uhler's Expert Rep.

[79] E005492- E00550; E005144-147 (Attached as Exh. 34).

[80] E005505-506 (Attached as Exh. 35).

[81] D000518, A-010503-508; WT031328-38 (Attached as Exh. 36).

[82] D002890-2894 (Attached as Exh. 37).

[83] Unimin-Ward 000010-12 (See Exh. 31).

[84] Unimin-Ward 000023-41 (See Exh. 31).

other nexus records show Ward added new oil to the unit on **September 9**, 1993.[85] Once again, the discrepancy in dates and results underscore Dr. Uhler's criticism of Plaintiffs' attempts to establish that there were PCBs in the transformer when it arrived at Ward with unverifiable and unreliable information.[86]

Even if Plaintiffs' proof on PCB concentrations were acceptable, the record is clear that Unimin did not have any knowledge about, or ability to control, Ward's work. Doug Losee, Unimin's General Manager of Environmental Affairs and former Ward employee Marvin Croson both testified that Unimin never directed or supervised Ward's repair work.[87] Mr. Losee also confirmed that Unimin would never have utilized a service provider that was not in compliance with environmental regulations.[88] Most importantly, Mr. Losee testified that if Unimin had considered the transformers, or their contents, to be hazardous in nature, then they never would have sent them to be repaired, but rather would have sent them to a licensed disposal facility and required receipt of a certificate of destruction.[89] That fact plus the fact that Unimin conducted extensive and proactive PCB audits at both the Spruce and Marston plants prior to transacting with Ward, further supports the company's belief that these transformers were not hazardous and that by sending them to be serviced by Ward they were in full compliance with EPA regulations.

All of the evidence, including the fact that there were multiple other repair transactions between the Ward and Unimin that Plaintiffs chose not to target, supports the fact that Unimin was merely engaging Ward for legally authorized maintenance, repair, and reconditioning work.

---

[85] D002890-2894 (See Exh. 37), A-014191 (Attached as Exh. 38).

[86] Losee Depo. 134:13-137:23 (See Exh. 33); Exh. 1, Uhler Expert Rep.

[87] Losee Depo., 132:11-18, 140:9-18 (See Exh. 33); Croson Depo. (2/19/2014) 252:16-253:5 (See Exh. 10).

[88] Losee Depo., 141:4-142:7 (See Exh. 33).

[89] *Id.*, at 1-21.

There is no evidence that any of the transformers were leaking at the time they were sent to Ward. They were still useful for their intended purpose – the transformation of voltages. All three were returned to Unimin and put back into use at the plants. Plaintiffs' baseless pursuit of Unimin must come to an end.

## Sonoco Products Company's Appendix to the
## Joint Memorandum of Law in Support of Summary Judgment

Founded in 1899, Sonoco Products Company is a global provider of diversified consumer paper packaging, industrial products, protective packaging, and packaging supply chain services, and is the world's largest producer of composite cans, tubes, and cores. The company is headquartered in Hartsville, South Carolina and has more than 335 operations in 33 countries, serving more than 85 nations. Plaintiffs originally targeted Sonoco as a defendant in this litigation based upon two separate transactions, fifteen years apart, which they described as the 1978/79 "repair" of two 50 gallon capacity transformers with serial numbers 73AG2736 and 70A7203; and, a "consignment" purchase of six transformers in 1992. During mediation in September 2015, Plaintiffs agreed to remove one of the "repaired" transformers and all six of the "consignment" units from negotiations.

**Transformer 73AG2736.** Unit 73AG2736 was manufactured in Westinghouse's Athens, Georgia plant, which never used PCBs and, therefore, Plaintiffs removed it from its targeted allocation list during mediation in September 2015.[90]

**Transformer 70A7203.** There are at least four separately numbered Ward inventory cards in Plaintiffs' nexus documents for transformer 70A7203.[91] Work on the transformer may have occurred first during July 1978 (after arriving in June),[92] but a different numbered inventory card also shows the same unit arriving at Ward on August 31, 1978 and finished on October 4,

---

[90] Sonoco-Ward-000005-09; (Attached as Exh. 39).

http://www.nj.gov/drbc/library/documents/PMP_Resources/Guidelines_PCBtransformers.pdf

[91] (#1333) WT046277-78, (#1446) WT046282; (#1362) WT046270; and (#1822 or 3) A006266 (Attached as Exh. 40).

[92] WT046279-80 (Attached as Exh. 41).

1978.[93] Ward's paperwork also shows the same transformer was at Ward for "warrantied", no cost work on October 18, 1978.[94] To add to the confusion, there is a document which suggests that Bob Ward, III ordered transformer 70A7203 to be scrapped on December 5, 1979.[95] Regardless of the mix and multitude of nexus documents, former Ward repair foreman, Frank Aguirre, reviewed the records and confirmed that there was no indication that transformer 70A7203 had any oil inside of it when it arrived at Ward, let alone, any concentration of PCB containing oil;[96] and there was no indication that it was leaking at any point in time.[97] Mr. Croson, who separately reviewed the nexus documents, also confirmed that his review showed no evidence that Sonoco provided Ward with any instructions on what to do on the repairs.[98]

There is absolutely no indication that the repair transaction(s) in 1978/79 involved PCBs at all and certainly no support for an argument that Sonoco knew about Ward's operations or controlled or instructed Ward in any manner.

**Transformers 4085461, 62, & 63 and 6357740, 41, & 42.** Larry Pattengill was Sonoco's Paper Division's Director of Environmental Affairs beginning in May 1990 and he worked his way up to his current role which is the Director of Global Environmental Services, meaning that he has environmental responsibilities for all of the facilities in the entire company.[99] In each of the positions he held, and still holds, his job responsibilities included

---

[93] WT046270-271 (Attached as Exh. 42).

[94] WT046268 (Attached as Exh. 43).

[95] A006266 (See Exh. 40).

[96] 7 Aguirre Depo. (2/4/2014), 728:1-8 (See Exh. 9).

[97] *Id.*, at 727:21-25; 892:10-894:11.

[98] Croson Depo. (2/19/2014), 219:15-22 (See Exh. 10).

[99] Pattengill Depo.,17:17- 21:7 (Attached as Exh. 47).

insuring the Company's compliance with PCB regulations.[100] Mr. Pattengill testified as the corporate representative in a deposition in 2014, during which he explained that in 1992, Sonoco's paper mill in Monroe, Ohio needed to upgrade its electrical system in order to handle a higher load; therefore, it removed and had available, six operable, useful transformers, to sell.

> 12    Q.  Why was Sonoco trying to sell these
> 13  transformers?
> 14         A.  They had completed an electrical upgrade or
> 15  higher load level at that plant and these transformers
> 16  would not be sufficient to carry the additional load.

Pattengill Depo., 74:12-16 (Exh. 47).

Mr. Pattengill confirmed that on December 1, 1992, Wayne Boyd from Sonoco Products' main office in Hartsville, South Carolina wrote to Wade Chase at Ward Transformer, offering to sell the six transformers.[101] The letter confirmed that the six transformers came from two 1500KVA transformer banks from the company's paper mill in Monroe Falls, Ohio and that each bank consisted of three 500KVA single-phase transformers.[102] The letter also made clear that each was in working condition when they were removed from service on Labor Day and that the most recent PCB tests on the units, conducted in September 1991, confirmed that all were non-PCB transformers.[103]

There is a subsequent letter, dated December 4, 1992, from Ward to Charles Stoudemire, plant manager of the Monroe Falls paper mill, indicating that Ward was offering a consignment/purchase arrangement for the six transformers which would pay Sonoco $5,010

---

[100] *Id.*

[101] B011539-43; B00440-443 (Attached as Exh. 44); Pattengill Depo., 72:4-73:9 (Exh. 47).

[102] *Id.*

[103] *Id.*; Pattengill Depo., 73:15-17 (Exh. 47).

($835 for each) upon their resale (and giving Ward the first right of purchase).[104]   The transaction was premised upon the units arriving at Ward non-PCB, electrically and physically sound, and not leaking oil when loaded onto trucks for transport to Ward.[105]

Plaintiffs' nexus records suggest that the transaction was consummated in some form, and the transformers remained in Ward's resale inventory until 2005, when Ward was shutting down and selling its remaining transformer inventory to a Chinese company.  In connection with the shutdown, Richard Brewer sent a letter to Mr. Stoudemire at the Monroe Falls paper mill's address indicating that the six transformers were still at Ward; and that, absent notice from Sonoco, Ward would take title to the equipment within seven days of the date on the letter.[106] However, the Monroe Falls paper mill had been shut down in 2001 and decommissioned,[107] and Brewer indicated "No Reply" was received to his 2005 letter.[108]

Consequently, as verified by former Ward employee deposition testimony, title to the six transformers had transferred to Ward seven days after sending the letter.[109] Testimony also confirmed that if, as Plaintiffs allege, oil was drained prior to shipping the units to China, it was done after title had transferred to Ward and without Sonoco's knowledge or consent.[110] The undisputable facts are that the transformers that Sonoco sold (consigned) to Ward were useful, operable, non-pcb, and had market value at the time they arrived at Ward in 1992.  In the sales-test case, Ward purchased 43 transformers from Georgia Power for an average of $928 per

---

[104] B011528-36 (Attached as Exh. 45); Pattengill Depo., 72:4-73:9 (Exh. 47).

[105] *Id.*; Croson Depo., 220:6-221:24  (See Exh. 10).

[106] B04421 (Attached as Exh. 46).

[107] Pattengil Depo. 25:9-10 (Attached as Exh. 47).

[108] Brewer file doc (Attached as Exh. 48).

[109] Croson Depo. 223:3-227:11.

[110] *Id.*

transformer, and the Court considered that to be evidence that the transformers had value. *GPC*, at 145. Here, Ward offered to pay $5,010 for the six transformers, or $835 each, which is similar in price to the Georgia Pacific transformers. There is no reason to distinguish Sonoco's "consignment" transactions from the sales in *GPC*.

On this record, and given the Fourth Circuit's *GPC* decision, Sonoco cannot be subject to CERCLA liability. There is simply no basis to conclude that Sonoco knew that Ward employees might accidentally and incidentally drip or spill oil, let alone oil contaminated with PCBs, during repairs of its transformer in 1978 or in connection to the 1992 sales (consignment). And, the record shows that Ward owned the so-called "consigned" transformers at the point when any oil may have been removed from them in 2005. Even if there were evidence that disposals and releases of PCBs occurred, there is no hint of any plan by Sonoco or any indication that Sonoco would have had any authority or ability to prevent such releases from occurring. Sonoco simply sent used, useful transformers to Ward to be repaired and returned, or to be resold. Sonoco is entitled to entry of summary judgment.

In denying the cross-summary judgment motions in the repair test case in 2013, the Court held that there were questions of fact concerning: (1) the presence of PCBs inside Broad River's transformers when they arrived at Ward, (2) whether PCBs contaminated the Ward site at the time of repairs to Broad River's transformers (whether there was a release or threatened release of a hazardous substance at the site), and (3) whether Broad River owned the transformers at the time of disposal. (460 Doc. 1166, at n. 30.)

More than two years have passed, and as demonstrated in the Joint Memorandum of Law and supporting exhibits, Plaintiffs still rely solely upon speculation, not facts, on each of the elements they must prove in order to survive summary judgment. *GPC*, 781 F.2d at 150, 152. Broad River, on the other hand, now has expert interpretation of the record and additional Ward employee testimony to provide the Court which show, conclusively, that Plaintiffs have no case.[111]  For example, in 2014, Ward sales manager and corporate secretary, Richard Brewer, clarified many of the misimpressions, attributed to him by Plaintiffs in their previous summary judgment filings (and which the Court to some degree relied upon in its 2013 Order). Importantly, Brewer made clear that his 2012 post-deposition affidavit was not based not upon his personal knowledge of the Broad River transactions as stated, but rather upon his knowledge just from reviewing certain documents and the affidavit provided by counsel.

> 24   Q.   You don't have any separate independent
> 25   recollection of the Broad River transaction; is
> 1297
>  1   that correct?
>  2        A.   No, ma'am

---

[111] *See* Joint Memorandum discussion, and the referenced reports and deposition testimony, of Dr.s Uhler, Shifrin and Embsbo-Mattingly.

Brewer Depo., (3/19/2014), Vol. 3, pt.2, 1296:24-1297:2 (See Exh.15).  Brewer also explained

that Plaintiff's counsel, Chris Smith, had approached him to sign the pre-drafted affidavit for the

stated purpose of correcting earlier testimony in 2010 about one of Broad River's transformers,

serial number 2059260, as well as to provide additional testimony about two other transformers.

> 7 Q.  Do you recall how this affidavit -- you
> 8 know, why you decided to provide this affidavit,
> 9 this -- this additional testimony?
> 10      A.  Well -- well, this was at the request
> 11 of the plaintiffs, and I think Chris communicated
> 12 to me that, apparently, there was some of the
> 13 documents -- some of the information was not
> 14 presented correctly at the deposition and -- and so
> 15 he had basically drafted the -- the basic
> 16 premises -- the outline of this -- of this -- of
> 17 this additional affidavit.
> 18      Q.  Uh-huh.
> 19      A.  And -- and we met and -- and went over
> 20 it and --
>
>                        . . .
>
> 14 Q.  And what was your understanding of --
> 15 of what the purpose of the affidavit was?
> 16      A.  That there -- like I said, some of the
> 17 information or the documents or something wasn't,
> 18 you know -- they didn't -- there was some,
> 19 apparently, maybe that was missing that he had not
> 20 maybe supplied when I testified before, if I
> 21 recall --
> 22      Q.  Okay.
> 23      A.  -- that being over three years ago.  I
> 24 knew there was a purpose for why we were --
> 25      Q.  Right.  Okay.  And then in -- in
> 1304
> 1 Paragraph 2 -- are you back on Page 2?
> 2      A.  Yes.  Yes, ma'am.
> 3      Q.  On Page 2, it also says, the purpose
> 4 was to describe transactions for two additional
> 5 transformers; do you see that?
> 6      A.  Yes.  Yes, ma'am.

Brewer Depo. (3/19/2014), Vol. 3, pt.2, 1298:7-20; 1303:14-1304:6.  Brewer also made clear that the phrase "*in the ordinary course*" used throughout the affidavit was not wording which he himself commonly used and that he did not mean to suggest that something always occurred in a certain way by agreeing to inclusion of that language in the pre-drafted affidavit.

```
13      Q.  Okay.  You spent a little time last
14  week, I think, talking about one of the phrases in
15  this paragraph, in -- in the ordinary course.
16      A.  Yes, ma'am.
17      Q.  Okay.  What does that mean to you, in
18  the ordinary course?
19      A.  Well, in -- in our processes with
20  whatever it was in -- in -- at Ward Transformer, if
21  it was a -- the normal process that we normally
22  carried out --
23      Q.  Okay.
24      A.  -- that would be in the normal
25  course --
1312
1       Q.  In the normal course?
2       A.  -- of -- of business, yes, ma'am.
3       Q.  So your -- your phraseology might be
4   the normal course, and Mr. Smith's might be in the
5   ordinary course?
6           MR. SMITH:  Object to the form.
7           THE WITNESS:  That -- that -- that may
8   be, yes, yes.
9   BY MS. FEDDER:
10      Q.  Okay.  I'm sorry, were you finished?
11      A.  No, I would -- I would agree with that.
12      Q.  Okay.  Okay.  Great.  In the ordinary
13  course is not the same as what always happened; is
14  that correct?
15      A.  That's correct, it's not what -- it's
16  not what could happen.
17      Q.  Okay.
18      A.  That's --
19      Q.  So it doesn't mean that something
20  always occurred that way?
21      A.  That's -- that is correct.
```

Brewer Depo. (3/19/2014), Vol. 3, pt.2, 1311:13-1312:21 (See Exh. 15).

As the Court will recall, Broad River was sued based upon three post-1982 transactions, two repairs and one sale. As now confirmed by Dr. Uhler, none of Broad River's nexus documents contain any semblance of scientifically reliable and verifiable PCB test results for any of the three transformers before their repairs by Ward.[112] Notably, in his 2014 deposition, Brewer made clear that all of the handwritten PCB references in Broad River's nexus documents reflected the PCB concentrations of Ward's own oil, from its storage tanks, that employees put back into the transformers *after* the units had been repaired.[113] Those handwritten notations, which the affidavit suggested were the PCB concentrations of Broad River's transformers, had nothing at all to do with the actual PCB content of oil in those transformers upon arrival at Ward.[114]

Brewer also confirmed that all of the work performed on Broad River's transformers took place inside of the High-bay building and after Ward was utilizing drip pans and drysorb to prevent the release of oil into the environment. Further, he stated that Mr. Aguirre was in the shop 90-95 percent of the time and that he would defer to Aguirre for the "minutia and the specific details" about how repairs were handled.[115] Brewer's clarifications about the location and handling of Broad River repairs, along with the testimony of Aguirre, Rappleyea, and Croson in their 2014 depositions (referenced in the Joint Memorandum) demonstrate that there is no basis to conclude that a disposal of PCBs occurred at Broad River's transformers or that releases of PCBs occurred when Broad River's transformers were repaired.

---

[112] Exh. 1, Uhler Rep., at 2 and 4.

[113] Exh. 15, Brewer Depo., (4/4/2014), 41:4-18.

[114] *Id.*

[115] *Id.*, at 58:20-25.

Since the test case ruling, Ward employees have also corrected any previous misimpression the Court may have had that Broad River instructed Ward or exercised any sort of control over Ward's repair work. In their 2014 depositions, both Brewer and Croson testified that the written descriptions for repair work on the Ward order sheets and inventory cards in the nexus documents were instructions from Ward salespeople, like Brewer and Croson, telling Ward repair personnel what to do with the equipment.

```
 1      Q.  Okay.  Is there any indication in any
 2  of those records that Broad River directed or
 3  supervised the repair work at Ward?
 4          MR. SMITH:  Object to the form.
 5          THE WITNESS:  No, ma'am.
 6  BY MS. FEDDER:
 7      Q.  And would -- in the normal course of --
 8  of Ward's operation, would customers supervise
 9  and -- and tell Ward what to do, you know,
10  precisely on how to make repairs to their
11  transformers?
12          MR. SMITH:  Objection to form.
13          THE WITNESS:  No, ma'am.
14  BY MS. FEDDER:
15      Q.  Okay.  And I'm just letting you know,
16  this is important, because the plaintiffs' counsel
17  essentially told the Court that Broad River and
18  other Ward customers were in charge of,
19  essentially, directed or controlled the repairs
20  that Ward did to their transformers --
21          MR. DARRAGH:  Objection.
22          MR. SMITH:  Objection to the form.
23  BY MS. FEDDER:
24      Q.  -- and I want -- I want to confirm with
25  you that that's not the case.
1322
 1          MR. SMITH:  Object to the form.
 2          MR. GINSBERG:  Object to form.
 3          THE WITNESS:  Well, I -- I think my
 4  statement would be, as I've said, they -- when we
 5  found out that the core was defective and had
 6  faults, I'm sure the salesman went back and -- and,
 7  you know, made them aware of that.
```

8  BY MS. FEDDER:
9       Q.  Okay.
10        A.  And whether he had the options
11  available at that point in time or not, here again,
12  he probably -- he was talking to the representative
13  of Broad River, and -- and at some point in time,
14  we gave them, you know, a quotation, whether it was
15  verbal or in writing, as to what that -- as to what
16  cost would be.
17       Q.  Uh-huh.
18        A.  And then they agreed to that.
19       Q.  They agreed to pay for further repairs?
20        A.  Right.  And -- and they agreed to the
21  process that we were fixing to do, the path of the
22  repair that we were fixing to do

                          . . .

Q.  All right.  And, Mr. Brewer, I did not
16  mean -- I did not mean to cut you off.  Were you
17  finished?
18        A.  I think I'm -- my point was that, as I
19  said, we proposed -- made a proposal to them to
20  replace the core, and they --
21       Q.  Okay.
22        A.  -- apparently agreed to that and then
23  we carried out the work process --
24       Q.  Okay.
25        A.  -- in our shop.
1324
1       Q.  Okay.  And would there have been any --
2  at any time Ward would tell a customer that we
3  might drip or spill oil while we're working on your
4  transformer?
5       A.  No, we -- that would not be in the
6  ordinary course that we would relay that type of
7  information.
8       Q.  Okay.  And in the ordinary course, by
9  this time, by 1987, Ward was particularly concerned
10  with complying with regulations when working on
11  oil-filled equipment; is that correct?
12            MR. SMITH:  Object to the form.
13            THE WITNESS:  And -- and as I have
14  testified, we were continually in an evolving-type
15  situation of trying to be more and more careful as
16  far as --
17  BY MS. FEDDER:

                          48

```
18      Q.  Okay.
19      A.  -- how we dealt as it related to -- as
20   to oil.
21      Q.  But --
22      A.  And -- and -- and -- and as far as --
23   as how we processed it and also even in the shop.
```

Brewer Depo. (3/19/2014), Vol. 3, pt.2, 1321:1-1322:22, 1323:15-1324:23; accord Brewer Depo. (4/4/2014), 38:21-25; 49:6-51:25 (See Exh. 15); *see also* Croson Depo., (2/19/2014), 253:9-256:25. 257:1-258:22; 258:22-260:1 (See Exh. 10).

 Brewer and Croson's confirmation of Broad River not controlling or directing Ward's work, coupled with the testimony from retired CEO of Broad River, Doug Wilson, (employed by the Cooperative from 1971-2014), are undisputed proof that Broad River did not "arrange for the disposal" of hazardous substances at Ward. Wilson testified that Broad River looked to Ward for its expertise in repairing substation transformers.[116] He also confirmed that Broad River's only intention for transacting with Ward was to get Broad River's transformers repaired so they could be put back into use.[117] Importantly, Mr. Wilson confirmed that Broad River expected Ward to comply with all environmental rules and regulations.[118] There is simply no support in the record for the Court to conclude that Broad River knew about, let alone intended for, Ward to drip or spill PCB-containing oil during the course of its repair work, and especially not in a manner that would threaten the environment.

 On this now complete and corrected record, it is clear that Broad River cannot be subject to CERCLA liability. It is undisputed that: (1) there is no scientifically reliable and verifiable evidence of PCBs in the transformers when they arrived at Ward, (2) Broad River had

---

 [116] Wilson Depo., 27:22-25; 128:19-129:5; 129:21-130:24; 146:9; 149:21-150:9 (Attached as Exh. 49)

 [117] *Id.*, at 28:21-29:4.

 [118] *Id.*, at 128:19-129:5.

no reason to suspect that Ward employees might accidentally and incidentally drip or spill oil, let alone oil contaminated with PCBs, during repairs of its transformers, (3) Broad River's intent in transacting with Ward was solely to have its transformers returned in operable condition, and (4) Broad River did not control, direct, or supervise Ward's work. Broad River simply sent used, useful transformers to Ward to be repaired and returned; Broad River is undisputedly entitled to entry of summary judgment.

By:  /s/ Jane E. Fedder
JANE E. FEDDER
MO Bar No. 38228
POLSINELLI PC
100 S. Fourth Street, Suite 1000
St. Louis, MO 63102
Telephone: (314) 552-6867
Facsimile: (314) 231-1776
Email: jfedder@polsinelli.com


        /s/ Patricia P. Shields
PATRICIA P. SHIELDS
N.C. State Bar No. 13005
HEDRICH GARDNER KINCHELOE &
    GAROFALO, LLP
4131 Parklake Avenue, Suite 300
Raleigh, NC  27612
Telephone: (919) 832-9494
Facsimile: (919) 832-9425
Email:  pshields@hedrickgardner.com
L.R. 83.1 Counsel

> *Counsel for Blue Ridge Electric Cooperative;*
> *Broad River Electric Cooperative, Inc.; Consumers*
> *Energy Company; Danny Corp.; Dixon Lumber*
> *Company; Electric Control Equipment Company;*
> *GKN Driveline North America; Gladieux Trading*
> *& Marketing Co.; Glenwood Regional Medical*
> *Center n/k/a Glenwood Resolution Authority, Inc.;*
> *LWB Refractories Company k/n/a Magnesita*
> *Refractories; Pharmacia LLC f/k/a Monsanto*
> *Company; Sonoco Products Co.; St. Joseph*
> *Medical Center; Southland Electrical Supply*
> *Company; Tri-State Armature & Electrical Works;*
> *Unimin Corporation; United Technologies*
> *Corporation, Pratt & Whitney Division, and*
> *Washington Suburban Sanitary Commission*

## CERTIFICATE OF SERVICE

I hereby certify that on December 11th, 2015 I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

> */s/ Jane E. Fedder*